**Martha YARDE, a/k/a Martha Chase, Plaintiff,**

v.

**GOOD SAMARITAN HOSPITAL, 1199 Service Employees International Union, Lorraine Freiberg, Elizabeth Burton and Linda Bassi, Defendants.**

No. 03 CIV.8015 (CM) (MDF).

United States District Court, S.D. New York.

March 1, 2005.

Roni L. Jacobson, Leroy Wilson, Jr., Esq. P.C., White Plains, NY, for Plaintiff.

Robin Beth Kallor, Clifton, Budd Et Ano., New York City, for Defendants.

## DECISION AND ORDER GRANTING ALL DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT DISMISSING COMPLAINT EXCEPT THE GSH DEFENDANTS' MOTION DIRECTED TO PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIMS

MCMAHON, District Judge.

Defendants Good Samaritan Hospital, Elizabeth Burton and Linda Bassi (collectively, the GSH Defendants) and 1199 Service Employees International Union (SEIU or the Union) and Lorraine Freiberg (collectively, the Union Defendants) have moved separately for summary judgment dismissing plaintiff's complaint, which asserts claims of racially-motivated discharge, hostile work environment and unfair representation. For the reasons set forth below, all motions are granted except that the motion of the GSH Defendants' for summary judgment dismissing plaintiff's claim of hostile work environment is denied.

**Standard for Summary Judgment**

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary

judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

### Undisputed Material Facts

Many of the facts in this case are hotly disputed. However, the material facts— the ones needed to adjudicate this case— are undisputed. I will describe the facts in the light more favorable to plaintiff, the non-moving party.

*Facts Relating to Plaintiff's Termination*

Plaintiff is a black woman of Caribbean ancestry. She is, by profession, a nurse. In March and April 2003, she was employed by Good Samaritan Hospital (GSH), a 370 bed non-profit hospital in Suffern, New York. GSH provides a full range of service, both acute and non-acute. Among its services is an Inpatient Chemical Dependency Unit (known as the T–5 Unit). Patients on that unit were undergoing treatment for drug and/or alcohol detoxification and rehabilitation. Plaintiff worked as a charge nurse on that unit.

On March 4, 2003, plaintiff was sitting alone at the nurse's station. On that evening, a patient, Robert "H.," came out of his room into the hallway, seeking methadone. Plaintiff claims (and for purposes of this motion we will assume this to be true) that Robert H. demanded methadone and threatened to kill plaintiff if she did not provide it. The patient did not physically attack plaintiff; he walked away from her. However, plaintiff was understandably upset. She locked herself in the nurse's station and called security and the night supervisor, Dale Ridenour, as required by hospital policy. Plaintiff claims, and for purposes of this motion I accept as true, that she was greatly upset by this incident and developed a fear of Robert H., although she did not encounter him again after the March 4 incident. Plaintiff also

contends that, because Ridenour did not administratively discharge the patient, she developed a belief that her employer would not protect her and she would have to protect herself.

On April 6, 2003, plaintiff reported for work on the night shift. She noticed that Robert H. had been re-admitted to the floor. He was sleeping at the time.

Plaintiff responded to the threat she perceived as a result of Robert H.'s presence on the unit by calling the police so she could file a complaint arising out of the March 4 incident. She did not call a supervisor or night security prior to taking this action, although at her deposition plaintiff testified that any calls to the police were required to be made through hospital security. (Yarde Tr. 79–80).

When the police arrived soon thereafter, they took plaintiff's report. As part of her report, plaintiff disclosed Robert H.'s name, thereby revealing to the police that he was being treated for chemical dependency.

GSH has several policies relating to patient confidentiality. The Hospital-wide policy (Ex. B attached to GSH's Notice of Motion) required all employees to maintain the privacy of all patients and prohibited the disclosure of any patient information without a signed release except where disclosure is permitted by law. The policy further provides that requests for information from, *inter alia*, public agencies (which would include the police) were to be honored only by authorized personnel and were to be referred to specified departments.

Employees on the T–5 unit were bound both by that policy and by state laws and federal regulations set forth at 42 U.S.C. §§ 290dd–3 and ee–3,[1] New York's Mental

---

**1.** 42 U.S.C. §§ 290dd–3 and ee–3 were amended and omitted in 1992, however the

Hygiene Law § 23.05, Public Health Law Article 270–F, 10 NYCRR Part 63 and 14 NYCRR Parts 1070 and 1072. These laws and regulations, in substance, forbid employees of a qualified chemical dependency unit to disclose *any* information relating to a chemical dependency patient, including the fact that a person is or was a patient in the unit, without the written and signed consent of the patient.[2]

Plaintiff, like other employees on the T–5 unit, signed an Attestation of Understanding of Confidentiality Requirement (Ex. C attached to GSH's Notice of Motion), in which she acknowledged having been advised that she was not to report to any person outside the substance abuse program that a patient is an alcohol or drug abuser in the absence of written patient consent, a court order or in a medical emergency. Plaintiff understood that GSH viewed breaching plaintiff confidentiality as a terminable offense; when she attended a GSH seminar and took a post-seminar test, she gave "breach of confidentiality" as an example of an offense that would result in termination. (Ex. E attached to GSH's Notice of Motion).

On April 7, 2003, Catherine Lopez, the System Director of Labor and Employment Relations at GSH, learned what had happened the night before. She determined that plaintiff should be suspended pending investigation of the incident.

Plaintiff was contacted by telephone and advised that she was suspended.[3] (Yarde Tr. 237–241.)

On April 10, 2003, plaintiff met with defendant Bassi (Clinical Nurse Manager of Behavioral Health), Richard Santiago (Bassi's "boss"[4]), Regina Murdock (Systems Manager of Employment and Labor Relations), and Anne Jacobs, a Vice President of plaintiff's union, defendant SEIU. At this meeting, plaintiff was advised that it was management's position that she had breached patient confidentiality when she called the police and filed a report containing the name of the patient, thereby disclosing that he was a patient being treated for chemical dependency. (Yarde Tr. at 237–243.)

After the meeting, plaintiff went to the T–5 unit, although she was suspended from her job. Personnel on the unit called management and advised that plaintiff was creating a disturbance on the floor. Mr. Santiago arrived and directed plaintiff to leave the floor. When she refused to leave, security was called, as was Ms. Jacobs, plaintiff's union representative. Plaintiff then agreed to leave.

The Hospital opened an investigation into plaintiff's conduct. Ms. Murdock contacted the Police Department and confirmed that plaintiff made a police report and that the patient's name appeared on the police report. At that point, the Hos-

2. Exceptions to this rule do not apply in the instant case. For example, patient information may be disclosed without the patient's consent for medical treatment purposes or pursuant to a court order. *See* 42 U.S.C. § 290dd–2(b)(2).

hospital's form appears not have been changed to reflect this. (*See* Exh. C to Defendants' Good Samaritan Hospital, Linda Bassi and Elizabeth Burton's Notice of Motion for Summary Judgment, dated Sept. 1, 2004.) The relevant provisions of both sections are now contained in 42 C.F.R § 290dd–2.

3. The parties dispute whether plaintiff was advised during that call as to the reason for her suspension, but that dispute is irrelevant here. (Yarde Tr. at 241:13–14.)

4. Mr. Santiago's exact title could not be located in the record before the Court. The plaintiff refers to him as Bassi's "boss" in her complaint, however (¶ 28), and defendants appear not to dispute that characterization.

pital's Human Resources Department made two attempts to schedule "due process" investigatory meetings. Plaintiff did not appear at either meeting.

The Union formally grieved plaintiff's suspension on April 16. The Human Resources Department scheduled two grievance meetings in May to discuss the suspension. Plaintiff did not appear at either of those meetings, either.

All meetings were scheduled to take place at the Hospital, which is where all employee grievances were processed. Plaintiff made it known that she did not wish to come to the Hospital, because she had been threatened with arrest if she returned to the building and because she was suffering from post-traumatic stress syndrome as a result of the events of April. The Union asked that the meetings be moved off-site. The Hospital refused, but assured Jacobs (who in turn assured plaintiff) that she did not face arrest if she attended the meetings. Plaintiff nonetheless declined to attend.

At that point, Catherine Lopez decided to terminate plaintiff's employment. A letter advising plaintiff of this was sent on June 6, 2003 (Ex. G attached to the Notice of Motion).

Upon plaintiff's termination, GSH retained the services of Nurse Janice Cash on a *per diem* basis to replace Yarde on the night shift on the T–5 unit. On September 15, 2003, Nurse Audrey Morgan was hired as plaintiff's permanent replacement. Nurse Morgan, like plaintiff, is black. Nurse Cash's race is disputed. (*See, e.g.,* Pl. 56.1 Statement ¶ 46; GSH Defendants' 56.1 Statement at ¶ 46.)

*Facts Relating to Plaintiff's Claim of Hostile Work Environment*

Plaintiff contends that she was subjected to a pervasively hostile work environment due to her race and her Caribbean ances-

try. On two occasions she complained to management about racially insensitive remarks made to her—one by Bassi, and one by Elizabeth Burton, a technician on the T–5 unit, who allegedly told plaintiff that she never had any trouble working with white nurses and did not like working with black nurses. Burton is also black. Plaintiff alleges that management did not properly handle her complaint about Burton, because she (plaintiff) ended up being disciplined. Plaintiff also alleges that she was subjected to comments about witchcraft and religiously-insensitive comments (though she brings no claim for credal discrimination) and that she was occasionally denied privileges or was disciplined more harshly than were white nurses.

Plaintiff attempts to bring the Union in as a defendant on her hostile work environment claim on what appears to be an aiding and abetting theory, by claiming that the Union, and specifically defendant Freiberg (who was plaintiff's Union representative) helped the Hospital maintain a hostile work environment. Plaintiff alleges that Freiberg exhibited disdain and mistreatment toward plaintiff, and while admitting that Freiberg never made any race-based comment to her, alleges that Freiberg's hostility was based on plaintiff's race.

*Facts Relating to Plaintiff's Claim of Unfair Representation*

Immediately after GSH suspended plaintiff, SEIU assigned Vice President Anne Jacobs to represent plaintiff. Jacobs met with plaintiff and GSH management and asked the Hospital to produce relevant documents. Thereafter, SEIU filed a timely grievance challenging the just cause of the disciplinary action. Plaintiff, however, refused to attend the grievance sessions—which was, of course, part of the basis for her ultimate termination. These

are the only facts that are material to plaintiff's claim for unfair representation.

## Discussion

1. **Plaintiff's Claim that She Was Discharged Because of Her Race Under Title VII, the New York State Executive Law and Section 1981 of the Civil Rights Act of 1866 Is Dismissed.**

The GSH Defendants are entitled to summary judgment dismissing plaintiff's claim for racially discriminatory discharge because she has not made out a prima facie case of discrimination.

■ In order to make out a prima facie case of employment discrimination under Title VII, Section 1981 or the Executive Law, a plaintiff must show (1) that she was a member of a protected group; (2) she was performing her job satisfactorily; (3) she was subjected to adverse employment action (in this case, discharge); and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Grady v. Affiliated Cent. Inc.*, 130 F.3d 553, 559 (2d Cir.1997).

Only if plaintiff establishes all four elements of the prima facie case does the burden shift to defendants, under the familiar *McDonnell–Douglas* standard, to articulate a legitimate, non-discriminatory reason for making the challenged employment decision. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). And only if defendants carry their burden of proffering a race-neutral reason for their decision does the burden shift back to plaintiff, who always bears the burden of proof, and who must prove both that the reason given by defendant was pretextual and that the real reason for the adverse employment action was unlawful discrimination.[5]

■ The plaintiff's burden at the prima facie case stage is minimal, but it is not non-existent. In this case, plaintiff has utterly failed to meet even her minimal burden, because she has not adduced any evidence tending to show that she was discharged in circumstances giving rise to an inference that her race was the reason.

There is absolutely no dispute that plaintiff, in flagrant violation of hospital policy, called the police without first going to security and then filed a complaint against a patient in which she gave the police the patient's name. There is absolutely no dispute that plaintiff, after being suspended for this action, failed to attend a total of four meetings—including two due process meetings and two meetings scheduled at the behest of her Union, which was grieving her suspension—in furtherance of GSH's investigation into her behavior. There is no dispute that Catherine Lopez fired plaintiff after all of these infractions were committed. And there is no dispute that plaintiff was replaced by at least one employee of the same race as she. Putting all these admitted facts together, I cannot say that plaintiff has met her burden of establishing that she was fired "in circumstances" giving rise to an inference of discrimination. The fact that plaintiff was fired and is black does not get her past that hurdle.

Plaintiff makes two arguments. First, she claims that she did not violate hospital policy, because Federal regulations do not in fact bar her from disclosing a patient's name to the police. Second, she claims that GSH's racism can be inferred from two racially-charged remarks made to her.

---

5. Plaintiff is just plain wrong when she asserts that she does not bear the burden of proving both pretext and discrimination.

The first was made by defendant Burton—a black technician who worked under plaintiff—who apparently complained that white nurses did not tell her what to do and that she would not allow a black nurse to tell her what to do. (Jacobson Aff., Ex. 21). This incident occurred within days of plaintiff's suspension. Three months earlier, in January 2003, defendant Bassi—plaintiff's supervisor—allegedly called plaintiff a "black bitch" and told her to "go back where you came from." (Pl. Tr. 95–96.)

■ I address the latter point first, because it can be disposed of quickly. It is well settled that stray racial remarks made by persons not involved in making the adverse employment decision are not sufficient to establish an inference of discrimination. *Godfrey v. Ethan Allen, Inc.*, 113 F.3d 1229 (2d Cir.1997); *Tanny v. St. Barnabas Hospital*, 2001 U.S. Dist. Lexis 2661 (S.D.N.Y.2001); *Magnan v. Manhattan Eye, Ear & Throat Hospital*, 2002 WL 334505, 2002 U.S. Dist. Lexis 4347 (S.D.N.Y.2002); *see also Townsend v. Clairol Inc.*, 26 Fed.Appx. 75, 2002 WL 83595 (2d Cir.2002) (unreported) (no error to disregard racial comments made by a supervisor eight or nine years before plaintiff began working at company); *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir.1992), *cert, denied*, 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993) (gender-based remark made five years before an adverse employment decision, and made by a partner who left the employer-law firm before the adverse decision, was not evidence of discrimination).

Here, the undisputed evidence shows that Catherine Lopez made the decision to fire plaintiff. There is no evidence whatever of racial animus on her part. Indeed, the undisputed evidence demonstrates that Lopez has fired white as well as black employees for similar infractions, and has never imposed any discipline other than termination for a violation of the Hospital's strict patient confidentiality policy.

Neither is there any evidence that either Bassi or Burton had any input into Lopez's decision; plaintiff's conclusory statement that Lopez "undoubtedly received information from Defendant Bassi and from Santiago," Pl. Mem. at 202, is unsupported by any record evidence. Mere speculation on plaintiff's part will not defeat a motion for summary judgment.

Additionally, the fact that plaintiff was replaced by at least one other black nurse (which "weighs heavily against the inference" of discrimination, *Montanile v. National Broadcast Co.*, 211 F.Supp.2d 481, 487 (S.D.N.Y.2002)) undercuts any possible inference that Burton's and Bassi's remarks (which I will assume, for the purposes of this motion, were in fact made) admit of an inference that plaintiff was fired in circumstances suggesting discrimination.

As for the former argument: plaintiff discusses at length the proposition that the federal regulations cited by defendant justify disclosing patient information where the patient presents an immediate threat. But the undisputed evidence discloses that Robert H. did not present an imminent threat to plaintiff or anyone else on the night of April 6–7, 2003. When plaintiff arrived at work, Robert H. was sleeping. Plaintiff admits that she was not treating him, that he did not become violent and did not speak to her. (Yarde Tr. 234–36). At no time during the evening did he so much as approach plaintiff (or anyone else) in a threatening manner. And plaintiff's complaint to the police did not concern any threat to her or anyone else that occurred on April 6–7. Rather, she complained about an incident that took place a month earlier, when Robert H. was last a patient

on the T–5 ward at GSH. So assuming arguendo that there was an exception to the federal regulations permitting disclosure in "immediate threat" situations, it would have no applicability to Yarde's situation on the undisputed facts.

Moreover, the hospital had its own policy prohibiting the disclosure of any patient's identity, as well as a rule, acknowledged by plaintiff at her deposition, that required any calls to the police to be routed through Hospital security. The hospital's policy (Ex. B) admitted of no exceptions to the non-disclosure of patient information that are relevant to this case. There was no court order directing disclosure and there was no medical emergency or program evaluation that necessitated disclosure. (Ex. C). Yet plaintiff violated both hospital policy and the rule concerning calls to the police. She called the police without first contacting GSH security, and then gave the police the name of a GSH patient as part of making a personal complaint about a month-old incident.[6] Any violation of federal or state law that occurred here was only icing on the cake—without regard to the law plaintiff had broken her employer's rules.

Because the circumstances of plaintiff's termination do not admit of any inference that she was discharged because of her race, plaintiff has not satisfied her minimal burden to make out a prima facie case.

However, assuming arguendo that a reasonable fact finder could find that plaintiff had proved a prima facie case, defendant is still entitled to summary judgment. Defendant has more than satisfied its burden of articulating legitimate, non-discrimina-

tory reasons for discharging Yarde: her breach of patient confidentiality, her causing a commotion on her unit following her suspension, and her refusal to participate in the investigation and grievance process.

▪ For all the reasons outlined above, no reasonable trier of fact could conclude that plaintiff satisfied her burden to prove (1) that the reason assigned by defendant was pretextual, and (2) that the real reason why defendant was fired was her race. The record is completely barren of any evidence—even a scintilla of evidence—that Yarde's discharge was racially motivated. There can be absolutely no doubt that—contrary to the belief of her counsel—plaintiff bears the burden of proving not just pretext, but racial discrimination, *St. Mary's Honor Center,* 509 U.S. at 511, 113 S.Ct. 2742, and thus the burden of pointing the court to the existence of evidence that would raise a disputed issue of material fact on this score. She has failed to do so.

In particular, the text of the letter terminating plaintiff's employment certainly does not admit of an inference of racial discrimination or suggest that the reasons assigned by GSH for dismissing Yarde are an after-the-fact pretext devised to cover up racism. The letter (Ex. G attached to the GSH Defendants' Notice of Motion) refers to plaintiff's refusal to participate in meetings with management over a two month period as "constructive resignation." In the alternative, it says that the Hospital has "concluded our investigation of *all the incidents at issue* and determined that you have engaged in *disruptive, insubordinate and uncoopera-*

---

**6.** Plaintiff's argument that the GSH Defendants' failure to raise "breach of confidentiality" as an "affirmative defense" (Pl Mem at 14) and failure to request a jury charge on "breach of confidentiality" (*id.*) somehow permits a juror to infer that Yarde's discharge was race-motivated is absurd. "Breach of confidentiality" is not an affirmative defense under the Federal Rules of Civil Procedure. It is the reason given by defendants for suspending and later discharging plaintiff.

*tive behavior."* The incidents under investigation at the time included the breach of patient confidentiality, the disruption caused by plaintiff following her suspension, and her refusal to cooperate in either management's investigation or the union's grievance of her suspension. The references to disruption, insubordination and lack of cooperation all relate directly and logically to those incidents. It is impossible to draw from this letter any suggestion that plaintiff was terminated in circumstances giving rise to an inference of racism.

### 2. Plaintiff's Claim of Retaliatory Discharge Is Dismissed.

Plaintiff also contends that her dismissal was in retaliation for her complaint, in mid-January 2003, about Bassi's "black bitch" remark. Again, there is no evidence that could take this issue to a jury.

■ In order to make out a prima facie case of retaliatory discharge, plaintiff must prove that she engaged in a protected activity known to defendant, she was subjected to adverse employment action, and there is a causal connection between the protected activity and the adverse employment action. While plaintiff has satisfied her burden of going forward on the first two elements, she has not raised any issue of fact concerning the third prong of the test—causal connection.

■ In this Circuit, an inference of causation is defeated (1) if the allegedly retaliatory discharge took place at a temporal remove from the protected activity; or (2) if there was an intervening causal event that occurred between the protected activity and the allegedly retaliatory discharge. *See, e.g., Adeniji v. Admin. for Children Services, NYC,* 43 F.Supp.2d 407, 433 (S.D.N.Y.1999). Here, there was a three month interval between plaintiff's complaint about Bassi's alleged remark and her suspension, and six months passed between her complaint and her termination. Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation. *See, e.g., id.* at 433–34. Six months between protected activity and discharge is well beyond the time frame for inferring retaliatory causation. *Clark County School District v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing with approval cases dismissing retaliation claims where adverse employment action followed protected activity by three to four months).

Furthermore, on this record, a reasonable fact-finder could only conclude that there were substantial intervening events between the January complaint and both the April suspension and the June discharge—first the patient confidentiality, second the ruckus created on the floor, and third, plaintiff's failure to cooperate in the hospital's investigation and in the union's grievance. Her suspension followed her breach of confidentiality by a matter of hours. Her termination came two months after her suspension, and followed hard on the heels of Yarde's refusal to attend the meetings scheduled by management and the Union. There is simply no basis for a reasonable trier of fact to infer that Yarde was fired for complaining about Bassi's remark.

### 3. Plaintiff's Unfair Representation Claim Against Her Union is Dismissed.

The only duty of fair representation claim relating to plaintiff that falls within the six month statute of limitations for bringing such claims relates to plaintiff's suspension following the April 6 incident involving Robert H. and plaintiff's eventual termination. In her brief opposing the

Union Defendants' motion for summary judgment, plaintiff admits as much.

■■■ The duty of fair representation (DFR) permits a union a broad range of discretion in carrying out its role as representative, and judicial review of union actions must be "highly deferential." *Spellacy v. Airline Pilots Ass'n–Intern.,* 156 F.3d 120, 126 (2d Cir.1998). A union only breaches its duty of fair representation if its actions can fairly be characterized as so far outside a wide range of reasonableness that they are wholly arbitrary, discriminatory or in bad faith. *Sim v. New York Mailers' Union,* 166 F.3d 465, 467 (2d Cir.1999). Arbitrary in this context means "irrational." *Spellacy,* 156 F.3d at 129, citing *Air Line Pilots Ass'n v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991), and even refusing to pursue a grievance does not automatically constitute a breach of the duty of fair representation. *Reed v. International U.A.W.,* 945 F.2d 198, 203 (7th Cir.1991). And while a union may violate its duty if it processes a grievance in a perfunctory fashion, *Vaca v. Sipes,* 386 U.S. 171, 191, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), a plaintiff cannot prevail on such a claim unless she establishes that further action on the Union's part would have resulted in a favorable outcome. *Sales v. YM & YWHA,* 2003 WL 164276 at *10 (S.D.N.Y.2003).

■■■ Drawing every possible inference in plaintiff's favor, no reasonable juror could conclude that the Union's conduct in this case fell outside the "wide range of reasonableness" that the law affords. The Union promptly appointed a representative for plaintiff and filed a grievance on her behalf on April 16, within days of her suspension. The grievance proceedings were scheduled to take place at the Hospital, where all grievance proceedings under the contract took place. Knowing that plaintiff did not want to come to the Hospi-

tal, her union representative asked that the site be changed—i.e., it sought special treatment for plaintiff. The Hospital refused to treat plaintiff any differently than it treated every other grieving employee. The union representative concluded that nothing in the contract could have compelled the Hospital to hold the meeting offsite. Her interpretation of the contract was not unreasonable. *Spellacy, supra.,* 156 F.3d at 128.

Plaintiff argues that she was unable to attend the scheduled grievance hearings because she was too traumatized by her suspension and her ouster from the T–5 unit on April 10 to reenter the building, and because she had been threatened with arrest if she reentered the Hospital.

The "threatened with arrest" point is easily dispensed with. The Hospital was required by the terms of the contract to allow the Union to grieve the discipline meted out to plaintiff and by contract it could not prevent Yarde from attending any proceedings connected therewith. Thus, GSH would have been in violation of the CBA had it arrested plaintiff for coming into the Hospital to attend a grievance meeting. Not surprisingly, there is no evidence in the record that the Hospital intended to breach the CBA in this regard. Rather, the undisputed evidence demonstrates that representatives of the Hospital assured plaintiff's Union representative that plaintiff would not be arrested if she came to the Hospital to attend the grievance sessions. The union representative conveyed these assurances to plaintiff. Plaintiff disputes none of this. Yet she refused to accept the invitation to return to the Hospital and grieve her suspension. Notwithstanding her efforts to recharacterize the situation, plaintiff did not lack access to the grievance process.

Because the contract specifies that either party's failure to appear at a griev-

ance on the scheduled time and date will result in a default, plaintiff was sent a warning and was invited to cure the default by appearing at a second session. She did not show up at that session, either. She was not excluded. She excluded herself.

When she was terminated in June, plaintiff did not ask the Union to file a new grievance challenging the decision. The Union thus concluded that Yarde was not willing to engage in the grievance process, which is the cornerstone of the contract.

Nothing about any of this—all of it undisputed—suggests that the Union's actions were arbitrary, discriminatory or taken in bad faith.[7] The Union did all it could to process plaintiff's grievance and vindicate her rights. A union member's failure to ask a union to file a grievance does not mean that the union failed in its duty to represent. *Mack v. Otis Elevator Co.*, 326 F.3d 116, 129 (2d Cir.2003). And where, as here, a plaintiff refuses to participate in scheduled grievance meetings, she "cannot avoid a finding that their claims are barred due to their failure to exhaust the remedies available under the collective bargaining agreement." *Fleming v. Stop & Shop Supermarket Co.*, 36 F.Supp.2d 87, 91 (D.Conn.1999), *see also Henry v. Community Resource Center*, 1996 WL 251845 at n. 6 (S.D.N.Y.1996). Finally, a union does not violate any duty by failing to secure special treatment for a member's grievance, such as processing it offsite. *Cooper v. Wyeth Ayerst Lederle*, 106 F.Supp.2d 479, 503 (S.D.N.Y.2000).

Plaintiff argues that Jacobs, the Union representative, conducted at best a perfunctory investigation. But plaintiff offers no evidence tending to show that the outcome of her grievance would have been any different had Jacobs done any more investigating—if only because plaintiff herself refused to participate in the grievance process, which was the final catalyst in her dismissal.

Plaintiff offers evidence about the Union's alleged failure to represent her on prior occasions to support her contention that the Union's actions vis a vis its handling of her April 2003 incident—the only grievance that can give rise to a timely DFR claim—was arbitrary and discriminatory. Her alleged "evidence" does not raise any genuine issue of material fact because it does not contradict what actually occurred after April 6, 2003. Once plaintiff was suspended, it is undisputed that the Union appointed a senior official to represent her; that the senior official interviewed plaintiff (who admitted disclosing the patient's name to the police and further admitted that the patient had not been threatening her at that moment); that the senior official urged plaintiff to file a formal grievance; that the senior official demanded copies of plaintiff's disciplinary file; that the senior official interviewed the Union delegate who had the most recent contact with the plaintiff; that the senior official did actually file a timely grievance; that the senior official attempted to obtain a special concession for plaintiff by asking that the grievance be processed off-site; and that plaintiff herself cut short the processing of that grievance by refusing to attend two scheduled grievance meetings. So even if plaintiff's allegations that the Union treated her inadequately on prior occasions were true—

---

7. Plaintiff also contends that she was unable to return to the Hospital because her doctor told her she had post-traumatic stress syndrome and should not go back into the building until she felt "safe." But if the reason she did not attend the scheduled sessions was physical or mental incapacity to reenter the Hospital, then defendants could hardly expect plaintiff to return to her job!

which does not appear to be the case (though I have no occasion to resolve the matter)—it would be of no moment.

■ Plaintiff also argues that her rights were somehow violated because delegate Freiberg, her charge nurse, was not assigned to represent her in connection with the April 2003 grievance. But it is well settled that Union members are not entitled to representation by the delegate of their choice—the Union has the right to designate who will represent a member in connection with a particular grievance. *United States Postal Service and NALC Local 27*, N.L.R.B. General Counsel Memorandum, Case Nos. 26–CA–20975 and 26–CB–4252 (March 13, 2003). *Cf. Blossomgame v. Local 1199 and United Presbyterian Residence*, 02 Civ. 1594, 2004 WL 2030285 (E.D.N.Y. Sept. 10, 2004) (no violation of a registered nurse's right to fair representation if she is represented by a delegate who is not an RN).

### 4. Plaintiff's Claim of Discrimination/Hostile Work Environment Against the Union and Freiberg is Dismissed.

Plaintiff's contention that the Union and Freiberg discriminated against her on the ground of her race and national origin, in violation of 42 U.S.C. § 1981 and Executive Law § 296, is something of a moving target. I will address all possible variations on this theme.

■ *Failure to Grieve Allegations of Discrimination:* A Union may violate Section 1981 if it intentionally fails to assert a member's grievance concerning race discrimination. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 667–69, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). But a Union has no duty to file a grievance unless the member asks that one be filed. *Mack v. Otis Elevator*, 326 F.3d 116, 129 (2d Cir.2003); *E.E.O.C. v. Pipefitters Ass'n*, 334 F.3d 656,

658–61 (7th Cir.2003). Plaintiff has not offered any evidence tending to refute the Union's showing that she did not complain to any Union representative about alleged discrimination until after she was suspended for revealing the patient's name to the police. Even then, when Yarde spoke with Jacobs, her union representative, she said she did not know why she felt treated differently from the other nurses—plaintiff did not assign race or national origin as the cause until her attorney wrote a letter on May 7, 2003.

Once notified of the nature of plaintiff's complaint, the grievance and arbitration process was the only forum available to the Union to raise plaintiff's concerns. *Pipefitters, supra.*, 334 F.3d at 659. It is not the Union's responsibility to eliminate harassment—that duty rests with the employer.

Jacobs explained to plaintiff in writing that her allegations of discrimination should be raised in the context of her April 16 grievance. If plaintiff has participated in that process, her complaints would have been raised and aired. But plaintiff herself left the Union powerless to act by abandoning the process. She cannot complain about the Union's handling of a matter she refused to pursue.

■ *Failure of Freiberg to Represent Plaintiff in Meetings Concerning her Altercation with Burton:* It is undisputed that plaintiff had union representation at all meetings called to deal with her altercation with Burton. The fact that she would rather have been represented by Freiberg is irrelevant. Freiberg was free to represent any Union member at the Hospital, and when Burton asked Freiberg (a personal friend) to represent her, Freiberg agreed. Freiberg could not represent both parties to the dispute. Certainly nothing about Freiberg's decision to repre-

sent Burton—who is also black—suggests racial discrimination.

Moreover, plaintiff never asked the Union to file a grievance challenging the discipline she received as a result of the Burton incident. Burton, by contrast, did ask the Union to grieve her corresponding discipline. It was up to plaintiff to make her dissatisfaction known to the Union. All the evidence suggests that her failure to do so, and nothing more, was the reason for any difference between how her situation was handled and how Burton's was handled.

Plaintiff's claims against Freiberg are utterly frivolous. There is no evidence in this record suggesting that Freiberg was motivated by any racial or ethnic animus toward plaintiff. It is undisputed that Freiberg never made any derogatory remarks toward plaintiff. It is also undisputed that plaintiff assigns Freiberg's personal friendship with Burton—a black woman—as the reason why Freiberg represented Burton (which somehow allegedly violated plaintiff's rights) and why she was "snide" to plaintiff after the Burton incident and called her "incompetent." None of that even remotely suggests that Freiberg has done anything to subject herself to liability under either Section 1981 or Executive Law § 296.[8]

■■■ *Hostile Work Environment:* Finally, plaintiff's claim of hostile work environment is dismissed as against the Union because it does not lie against the Union. The employer, not the union that represents employees, has a duty to maintain a workplace that is free of pervasive hostility based on impermissible factors. All a Union can do is file a grievance when a member complains of hostile work environment. As discussed above, plaintiff never sought to have the Union grieve this issue—never even raised it as an issue until May 2003—and when presented with the opportunity to raise it in connection with her then-pending grievance, plaintiff chose to walk away from the grievance.

■■■ And her corresponding claim against Freiberg is dismissed because, as discussed above, there is no evidence in the record from which a reasonable juror could conclude that Freiberg was a supervisor with authority that would render her liable if the workplace were hostile, or that she personally exhibited any racially or ethnically discriminatory behavior. As plaintiff herself admits, "Personal liability under Section 1981 must be predicated on the actor's personal involvement." *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 75 (2d Cir.2000). There is absolutely no evidence that Freiberg was personally involved in racially hostile activity that so permeated the workplace as to interfere with plaintiff's ability to do her job.

## 5. Plaintiff's Hostile Work Environment Claim Against GSH Must Go To Trial.

This leaves plaintiff's claim of hostile work environment against GSH.

■■■ To defeat a motion for summary judgment on a claim of racially hostile work environment, a plaintiff must produce evidence that the workplace was per-

8. Because Freiberg was not plaintiff's supervisor and did not work alongside her, she cannot be held liable under Section 1981 in any event. *McCoy v. City of New York,* 131 F.Supp.2d 363, 376–77 (E.D.N.Y.2001); *Tekula v. Bayport–Blue Point School Dist.,* 295 F.Supp.2d 224, 232 (E.D.N.Y.2003); *see* *also Brennan v. Metropolitan Opera Ass'n,* 192 F.3d 310, 318 (2d Cir.1999) (allegedly discriminatory comments must create an environment "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment.").

meated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of the victim's employment. Isolated incidents ordinarily will not rise to the level of hostile work environment. *Oncale v. Sundowner Offshore Services,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

▬ Whether the conduct alleged was so "severe and pervasive" as to create "an objectively hostile or abusive work environment" is to be decided based on the totality of the circumstances, in light of such factors as the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating or was merely an offensive utterance, and whether it unreasonably interfered with an employee's work performance. Where reasonable jurors could disagree as to whether incidents of racial (or national origin) insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue may not properly be decided as a matter of law. *Patterson v. County of Oneida,* 375 F.3d 206, 227 (2d Cir.2004).

▬ While the issue is a close one, I conclude that GSH's motion for summary judgment on this claim should be denied.

GSH attempts to limit plaintiff's claim to the two incidents involving Bassi and Burton, and if that were all there was to the hostile work environment claim I would readily grant the motion to dismiss, on the ground that two racial remarks made over a span of several months is insufficiently "pervasive" to qualify as a hostile work environment. But while the Bassi and Burton incidents and GSH's handling of those incidents are clearly the cornerstone of plaintiff's hostile work environment claim, I am constrained to note that plaintiff contends that there were additional discriminatory incidents, including differential discipline meted out by Bassi to

plaintiff and white nurses, incidents when co-workers, including Burton, taunted her with witchcraft symbols and made jokes about her religious beliefs (I must observe that plaintiff has not alleged religious discrimination, but this evidence, if credited, could also be attributable to ethnic discrimination) and refused to give plaintiff free meals or days off during snowstorms while allowing those privileges to white nurses. (Plaintiff also assigns Dale Ridenour's failure to administratively discharge Robert H. immediately after the incident when he threatened her, but there is absolutely no evidentiary basis to ascribe this decision to any racial or ethnic motive).

To say that plaintiff's hostile work environment claim is thin may be to distinguish it. As defense counsel correctly point out, this case is not even remotely like *Petrosino v. Bell Atlantic,* 385 F.3d 210 (2d Cir.2004), in which the Second Circuit reversed a grant of summary judgment in favor of an employer where plaintiff offered evidence of literally constant hostility based on her gender. In that case, there was uncontested evidence of "incessant sexually offensive exchanges at the daily assignment meeting and omnipresent sexual graffiti in the terminal boxes." *Id.* at 221.

However, *Petrosino* does not stand for the proposition that nothing less than that truly horrible workplace ambience it describes can constitute a hostile work environment. In a circumstance where I must bend over backwards to draw every inference in favor of plaintiff, caution impels me to deny GSH's motion for summary judgment.

### Conclusion

All motions for summary judgment are granted except the motion by GSH, Bassi and Burton to dismiss plaintiff's claims of hostile work environment. All claims are

dismissed against the Union and Freiberg, but I will not enter a Rule 54 judgment at this point in time. Plaintiff and the GSH Defendants are directed to file a revised pre-trial order, addressing only the hostile work environment claim, within 20 days of the date of this decision. The parties are advised that evidence concerning the suspension and termination of plaintiff will not be admitted at trial. That evidence has no probative value on the discrete issue of hostile work environment. The witness and exhibit lists should be pruned to limit the evidence to the issue of what the work environment was like before the night of April 6–7. Thereafter, the parties are on 24 hours notice for final pre-trial conference and trial. No excuses of any sort accepted. If the parties prefer a date certain for trial they should consent to trial before the Magistrate Judge.

All other pending motions, whether to dismiss the complaint or to strike, are denied as moot in view of the foregoing opinion. The Clerk of the Court is directed to remove all motions in this action from the court's list of pending motions.