Antonio **VELASQUEZ, Jr., Plaintiff,**

v.

**METRO FUEL OIL CORP., Apollo Petroleum Transport LLC, and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (AFL–CIO) Local 553, Defendants.**

No. 12–CV–1548 (NGG)(LB).

United States District Court,
E.D. New York.

Signed March 31, 2014.

Antonio Velasquez, Jr., pro se.

Cristina E. Gallo, William K. Wolf, Friedman & Wolf, Michael E. Norton, New York, NY, for Defendants.

## MEMORANDUM & ORDER

NICHOLAS G. GARAUFIS, District Judge.

Before the court are Plaintiff Antonio Velasquez's objections to Magistrate Judge Lois Bloom's Report and Recommendation ("R & R") that recommended granting summary judgment for Defendant International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (AFL–CIO) Local 553 ("Local 553" or "the union") on Plaintiff's federal claims, dismissing Plaintiff's state law claims without prejudice, and denying Plaintiff's cross-motion for summary judgment. For the reasons set forth below, the R & R is ADOPTED IN FULL.

## I. BACKGROUND

### A. Factual Background

Unless otherwise noted, the following facts come from Local 553's Rule 56.1 Statement of Undisputed Material Facts ("Def.'s 56.1 Stmt." (Dkt. 53)) and were acknowledged by Plaintiff in his Response to Defendant's Proposed Finding of Facts ("Pl.'s 56.1 Resp." (Dkt. 57)). Defendants Metro Fuel Oil Corporation and Apollo Petroleum Transport LLC (collectively "the employer") hired Plaintiff as a fuel oil truck driver on December 15, 2008.[1] (Def.'s 56.1 Stmt. ¶ 9.) On December 29, 2008, Plaintiff spilled approximately five gallons of oil during a delivery to a customer. (Id. ¶ 48.) Plaintiff completed a spill report, explaining that although he followed written company procedure for unloading the oil, the particular truck assigned to him required a different unloading method. (Id. ¶ 52.) Plaintiff had not been fully trained in how to unload this particular truck. (Compl. (Dkt. 1) at 150.)[2] In discussing the incident with the union steward, Ken Orrichio ("Orrichio"), and the safety supervisor, Roger Romance ("Romance"), Plaintiff pointed out the discrepancy between the written instructions and the actual unloading procedure required for the delivery truck assigned to him. (Def.'s 56.1 Stmt. ¶¶ 54–55.) Romance said to him, "you are the only one who ever pointed out anything in our written policy, and that can hurt the company you know." (Id. ¶ 55; Pl.'s 56.1 Resp. ¶ 54.) The employer subsequently placed labels on the trucks requiring different unloading procedures and edited the company manual. (Def.'s 56.1 Stmt. ¶ 54; Compl. at 27.) Plaintiff believed that the employer was going to receive a $43 million grant from the government and speculates that by pointing out the error in the company manual, he may have jeopardized those funds. (Wolf Decl. in Supp. of Def.'s Mot. for Summ. J. at Ex. B (Velasquez Dep.) (Dkt. 51–2) 171:24–173:2.) Plaintiff alleges that after the spill incident, he

---

[1]. On September 27, 2012, the employer filed for Chapter 11 bankruptcy under Title 11 of the U.S.Code. (Not. of Bankr.(Dkt. 38).) Therefore this action is stayed against those defendants. (See Nov. 21, 2012, Order (Dkt. 40), 2012 WL 5879443.)

[2]. Plaintiff's Complaint appends numerous supporting documents, which Plaintiff refers to as his "Prima Facie Court Case File." For ease of reference, these documents are cited collectively as Complaint and referred to by ECF page numbers.

suffered pay shortages, sabotage of his delivery truck, and other mistreatment in retaliation.

### 1. *Pay Shortages*

During his employment, Plaintiff reported to Orrichio that the employer was shorting his pay for overtime hours and holidays worked. (Def.'s 56.1 Stmt. ¶ 101.) Each time Plaintiff complained, Orrichio spoke to the employer on Plaintiff's behalf, and the pay shortage was remedied. (*Id.* ¶¶ 102–104.) Plaintiff maintains, however, that Orrichio grew resentful of having to address Plaintiff's repeated complaints. (Pl.'s 56.1 Resp. ¶ 103.)

In 2009, union members ratified a new collective bargaining agreement ("CBA"), under which Plaintiff believes he was entitled to a higher wage. (Def.'s 56.1 Stmt. ¶ 107.) Plaintiff points to a notice dated March 25, 2009, announcing the vote on the CBA that was distributed by the union and states that the agreement entitles members to certain wage increases. (Pl.'s 56.1 Resp. ¶ 107 (citing Compl. at 102–03).) Plaintiff did not obtain a copy of the CBA until late 2009. (*Id.*) Defendants contend that because Plaintiff was hired after March 1, 2007, he is subject to an exception to the regular hourly wages under the CBA. (Def.'s 56.1 Stmt. ¶ 108.) Article XXV(B) of the CBA states:

> Drivers hired on or after March 1, 2007 shall be paid Two ($2.00) dollars per hour less than the above rates during the first year of employment; Additionally, Drivers hired on or after March 1, 2007 shall receive Fifty (.50) cents per hour less during their second year of employment at the end of which time they will receive the regular rate of pay then in effect.

(Compl. at 142.) The "above rates" referenced in the CBA are the same as the wages increases detailed in the March 25, 2009, notice. (*Compare id.* at 142, *with id.* at 102.) Plaintiff does not dispute the language of the agreement. (Pl.'s 56.1 Resp. ¶ 108.)

### 2. *May 2009 Termination*

In May 2009, the employer terminated Plaintiff because he did not have a Transportation Worker Identification Credential ("TWIC") card, a credential issued by the Transportation Security Administration ("TSA") that was required for fuel tanker drivers to deliver to certain oil terminals. (Def.'s 56.1 Stmt. ¶¶ 85, 87.) At the time, Plaintiff's application for a TWIC card was pending with the TSA. (*Id.* ¶ 86.) Although the union claims the employer only became aware of Plaintiff's lack of a TWIC card in May 2009 (*id.* ¶ 84), Plaintiff contends that he advised the employer about the pending status of his TWIC card during pre-employment orientation (Pl.'s 56.1 Resp. ¶ 84). The employer offered to reinstate Plaintiff once he obtained a TWIC card. (Def.'s 56.1 Stmt. ¶ 88.) Plaintiff contacted the union, and a representative told him that "there was nothing the union could do for [him]" and "to give the [TSA] hell" regarding his pending application. (*Id.* ¶ 90.)

After his termination, Plaintiff applied for unemployment benefits, but the benefits were suspended because the employer contested Plaintiff's application by falsely asserting that Plaintiff had voluntarily quit. (*Id.* ¶ 94; Pl.'s 56.1 Resp. ¶ 95.) Plaintiff's benefits were reinstated after the employer failed to appear for a hearing and Plaintiff was granted default judgment by the New York Department of Labor. (Def.'s 56.1 Stmt. ¶ 95; Pl.'s 56.1 Resp. ¶ 95.) Plaintiff claims he contacted Orrichio about the employer's misrepresentations to the Department of Labor and other issues stemming from his termination. (Pl.'s 56.1 Resp. ¶ 96.) The union, however, contends that Plaintiff did not

inform it of the any problems with his unemployment benefits until January 2010. (Def.'s 56.1 Stmt. ¶ 96.)

Plaintiff obtained a TWIC card in September 2009 and returned to work for the employer.[3] (*Id.* ¶¶ 97–98.) Plaintiff retained his original date of hire and was paid the same wage as before his termination, but he was placed at the bottom of the seniority list. (*Id.* ¶ at 99; Compl. at 152.)

### 3. *Truck Tampering and Harassment*

Plaintiff also made complaints to the union that his truck had been tampered with in ways that compromised his safety. Plaintiff cites incidents in which oil leaked from the back of his vehicle; the gear shift broke while Plaintiff was driving and appeared to have been hacksawed; and he discovered his truck's hose to be unexpectedly over pressurized to a dangerous degree. (Def.'s 56.1 Stmt. ¶¶ 111–16; Compl. at 40–47.) In addition, on at least four occasions, Plaintiff was dispatched to delivery locations on streets that did not have adequate space to safely park his truck. (Compl. at 47–49.) He relayed these incidents to Orrichio, Scott Anslwyck (a manager) ("Anslwyck"), and the company dispatcher. (*Id.* at 48.)

Plaintiff also complained to the union that he was subjected to harassment and verbal and physical intimidation by the employer. (Def.'s 56.1 Stmt. ¶ 117.) For example, Anslwyck accused Plaintiff of being unproductive and getting paid to do nothing. (*Id.;* Compl. at 29.) When Plaintiff complained about his safety concerns, Anslwyck would respond dismissively, telling Plaintiff to "shut up" or that "there are a lot of people out of work." (Compl. at 29, 37.) Plaintiff complained

repeatedly to Orrichio about the mistreatment. (Def.'s 56.1 Stmt. ¶ 118.) On at least one occasion, Orrichio angrily responded "No one here is out to get you!" (*Id.* ¶ 119.) In addition, a rubber rat was placed in the employee locker room shortly after the spill incident. (Def.'s 56.1 Stmt. ¶ 131; Pl.'s 56.1 Resp. ¶ 131.) Plaintiff speculated that the rat was directed at him, but "did not think much about the plastic rat." (Def.'s 56.1 Stmt. ¶¶ 132–33; Pl.'s 56.1 Resp. ¶¶ 132–33.) Plaintiff also complained that his workload was very heavy. (*Id.* ¶ 100.)

### 4. *Discrimination*

Plaintiff claims that he faced discrimination on the job. For example, in December 2009, Plaintiff reported to Anslwyck that his identification card was missing, and Anslwyck responded "Did you look for it in the crack of your ass, you stupid spic!" (*Id.* ¶¶ 125–26; Pl.'s 56.1 Resp. ¶ 125.) Plaintiff reported the statement to another employee but did not tell a representative of the union. (Def.'s 56.1 Stmt. ¶¶ 127–28.) The union claims that this was the only incident "where Plaintiff believed that he was discriminated against on the basis of his identity as a 'Hispanic American' and his 'international heritage.'" (*Id.* ¶ 129.) Plaintiff maintains that while this comment was the only "verbally articulated [discriminatory] statement made against him," there were other "physical demeanors," "facial expressions," and "adverse employment acts," such as the incidents discussed above, that he claims are evidence of discrimination. (Pl.'s 56.1 Resp. ¶ 129.) Plaintiff could not provide any other specific examples of discrimina-

---

**3.** Plaintiff disputes that he was "reinstated" by the employer, maintaining that he was instead "forced to file a new employment application by the defendant employer and

was told that he (Plaintiff) would have to pass a second 90 day[ ] probation period ...." (Pl.'s 56.1 Resp. ¶ 98.)

tion during his deposition. (Def.'s 56.1 Stmt. ¶¶ 122–124.)

Plaintiff has put forward different reasons for his alleged mistreatment by the employer and the union. During his deposition, he testified that he claimed discrimination on the basis of race, color, national origin, sex, and age because he did not know the actual reason for Defendants' actions. (*Id.* ¶ 134.) He stated that he "later learned that it had to do with the spill complaint the [he] filled out" and testified that he sought to amend his Complaint to allege only retaliation instead of the other bases for discrimination. (*Id.* ¶ 134; Velasquez Dep. 148:9–150:25.) In his Rule 56.1 Response, however, Plaintiff points out that Orrichio, who is Italian American, was responsible for a thousand-gallon spill but was later promoted to shop steward by the union (Pl.'s 56.1 Resp. ¶ 134), an indication that Plaintiff still intends to pursue a Title VII claim for discrimination of the basis of national origin.

### 5. *January 2010 Termination*

On January 12, 2010, Plaintiff delivered approximately 350 gallons of fuel to the wrong address.[4] (Def.'s 56.1 Stmt. ¶ 57.) The delivered fuel was the wrong grade for the customer's building. (*Id.* ¶ 58; Compl. at 51.) Plaintiff did not follow the employer's safety procedures when making the delivery or reporting the incident. (Def.'s 56.1 Stmt. ¶ 60.) Plaintiff left the location of the wrong delivery, delivered the remainder of the fuel to the correct customer, and began to drive to the next customer before reporting the incident. (*Id.* ¶ 61.) While Plaintiff admits this, he contends that Defendants' mistreatment of him "had a direct adverse effect on [his] ability to reason with logic and rationalize

correctly, and as a direct result, [he reported the incident] … at the time [he] deemed safe and appropriate." (Pl.'s 56.1 Resp. ¶ 60.) The union claims that to remedy the error, the entire contents of the first customer's fuel tank had to be pumped out and replaced with the proper fuel grade at the employer's expense of $8,000. (Def.'s 56.1 Stmt. ¶ 59.)

The following day, Romance fired Plaintiff. (Def.'s 56.1 Stmt. ¶ 65.) Plaintiff asked Orrichio, the union steward, to grieve the termination. (*Id.* ¶ 67.) On January 26, 2010, Plaintiff, Orrichio, Romance, the union president Jack Dresch ("Dresch"), and a senior manager Anthony Peretta ("Peretta") attended the grievance meeting. (*Id.* ¶¶ 71–72.) Immediately before the grievance meeting, Plaintiff briefed Dresch about his case. (*Id.* ¶ 68; Pl.'s 56.1 Resp. ¶ 74.) There is some dispute about how the meeting began. Plaintiff claims that after everyone sat in silence for a while, he asked if Dresch was going to say anything on his behalf, and Dresch replied "No, you speak." (Pl.'s 56.1 Resp. ¶ 74.) The union's facts strike a different tenor, contending that "Mr. Dresch gave Plaintiff the opportunity to speak first." (Def.'s 56.1 Stmt. ¶ 74.) Plaintiff then relayed his complaints about pay shortages, the truck sabotage, the employer's misrepresentation related to his unemployment benefits, his termination for the TWIC card, and other mistreatment. (*Id.* ¶ 75.) Peretta stated that the purpose of the meeting was to discuss Plaintiff's termination due to the wrongful delivery. (*Id.* ¶ 75.) Plaintiff claims he offered to pay the company $ 8,000 in damages, but Orrichio said that such an arrangement would be illegal. (Velasquez

---

**4.** The union's Rule 56.1 Statement states "350 hundred gallons," and Plaintiff acknowledges this fact. (Def.'s 56.1 Stmt. ¶ 57; Pl.'s 56.1 Resp. ¶ 57.) However, the portions of the Complaint cited by the union make clear that the actual amount was approximately 350 gallons. (Compl. at 16, 49, 78, 83, 123.)

Dep. 232:17–22.) Plaintiff asked if he would be rehired, and Peretta responded no. (Def.'s 56.1 Stmt. ¶¶ 78–79.) Plaintiff then walked out of the meeting. (*Id.* ¶ 75; Velasquez Dep. 232:23–233:5.) Plaintiff claims he left the meeting because it became clear that Defendants were only there to humiliate him and he was also suffering pain and discomfort. (Pl.'s 56.1 Resp. ¶ 80; Velasquez Dep. 233:18–25.)

## B. Procedural History

On January 28, 2010, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") against the employer and the union, alleging discrimination and retaliation. (Compl. at 12–16.) The complaint alleged discrimination by Romance, Anslwyck, and Dresch on the basis of age, arrest record, race/color or ethnicity, sex, and retaliation. (*Id.* at 12–13.) As for the specific acts of discrimination, Plaintiff alleged that he was fired, demoted, harassed or intimidated, denied benefits, paid a lower salary than others with the same title, given a disciplinary notice, and suffered "verbal abuse by supervisor[,] denial of privileges and due process of law." (*Id.* at 14.) Specifically regarding the union, Plaintiff alleged that after his January 2010 termination, the union "failed to render due process" at the grievance meeting. (*Id.* at 15.) On December 28, 2011, the NYSDHR dismissed Plaintiff's complaint and annulled the election of remedies pursuant to Plaintiff's request. (*Id.* at 20–21.) A December 8, 2011, NYSDHR letter acknowledging Plaintiff's request for dismissal stated "[w]here a complaint is dismissed on the grounds that the election of remedies annulled, any subsequent Human Rights Law action must be brought in state court within three years from the original date that the discrimination occurred." (*Id.* at 18.)

On or about July 7, 2010, Plaintiff also filed a charge with the National Labor Relations Board ("NLRB"), alleging violations of the National Labor Relations Act ("NLRA") by the employer and the union. (*Id.* at 23–60.) On August 26, 2010, the NLRB dismissed the charge, stating in part that "[w]ith respect to your charge against the Union, again, it is able to show that its decision not to pursue your discharge grievance, or your claim regarding contractual wages, was not outside the bounds of the discretion the law allows." (*Id.* at 159.) Plaintiff's appeal of this decision was also denied. (*Id.* at 162.)

Plaintiff also filed a charge with the EEOC alleging Defendants' discriminatory conduct. (*Id.* at 4.) On February 6, 2012, the EEOC issued him a Right to Sue letter, noting that Plaintiff "wishes to pursue the matter in Court." (*Id.* at 22.) On March 29, 2012, Plaintiff filed this action against the employer and the union, alleging that they violated his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and the Age Discrimination in Employment Act of 1967, 29 §§ 621, *et seq.* ("ADEA"), and other state law causes of action. (Compl. at 1, 3.) The union and Plaintiff both moved for summary judgment, and this court referred the motions to Magistrate Judge Lois Bloom for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b)(1). (Oct. 9, 2013, Order (Dkt. 63).)

On February 18, 2014, Judge Bloom issued the R & R, recommending that the court (1) grant summary judgment for the union on Plaintiff's federal claims, (2) dismiss Plaintiff's state law claims without prejudice, and (3) deny Plaintiff's cross-motion for summary judgment. (R & R at 417–18.) The court granted Plaintiff's request for an extension of time to file objec-

tions to the R & R. (Mar. 3, 2014, Order (Dkt. 66).) Plaintiff then timely filed his objections and supplemental supporting documents. (Pl.'s Obj. (Dkt. 67); Pl.'s Mar. 25, 2014, Ltr. (Dkt. 70).) Plaintiff also filed a motion for a settlement conference, a motion to disqualify the union's counsel, and a motion to appoint pro bono counsel. (Dkts. 68–69.)

## II. STANDARD OF REVIEW

▮ When a magistrate judge issues an R & R on a dispositive motion, and the R & R has been served on the parties, a party has fourteen days to object. Fed. R.Civ.P. 72(b)(2). If the district court receives timely objections to the R & R, the court makes "a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. [The district court] may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). However, to obtain this de novo review of a magistrate judge's R & R, an objecting party "must point out the specific portions of the report and recommendation to which [he] object[s]." *U.S. Flour Corp. v. Certified Bakery, Inc.*, No. 10–CV–2522 (JS), 2012 WL 728227, at *2 (E.D.N.Y. Mar. 6, 2012).

▮ If a party "makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *Pall Corp. v. Entegris, Inc.*, 249 F.R.D. 48, 51 (E.D.N.Y.2008); *see also Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir.2002) (holding that a plaintiff's objection to an R & R was "not specific enough" to "constitute an adequate objection under … Fed.R.Civ.P. 72(b)"). Portions of the R & R to which a party makes no objection are also reviewed for clear error. *U.S. Flour*, 2012 WL 728227, at *2.

## III. PLAINTIFF'S OBJECTIONS

Plaintiff's objections comprise nine pages, of which the first six cite statutes, federal rules, and case law related to the scope of magistrate judge authority. (Pl.'s Obj. at 1–6.) Following that is a section entitled "Plaintiff's Prima Facie Factual Allegations," which largely repeats the claims in Plaintiff's Complaint and cites to documents filed with the Complaint. (*Id.* at 6–7.) The final two pages contain further objections divided into two sections: "Partial Errors of Facts in Magistrate's Report" and "The Errors of Fact in the Magistrate Judge's R & R." (*Id.* at 8–9.)

▮ Because Plaintiff is proceeding pro se, the court reads his objections "liberally and will interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994); *see also Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) ("A document filed pro se is to be liberally construed."). However, the court "need not argue a *pro se* litigant's case nor create a case for the *pro se* which does not exist." *Molina v. State of N.Y.*, 956 F.Supp. 257, 259 (E.D.N.Y.1995).

Under this charitable reading, the court finds that Plaintiff has put forward a number of objections to specific portions of the R & R, which shall be reviewed de novo. The remaining objections are conclusory or general and therefore require, along with the unobjected to portions of the R & R, clear error review. *See U.S. Flour*, 2012 WL 728227, at *2.

### A. Specific Objections
#### 1. *Referral of the Motions to Judge Bloom*

▮ The court construes the first two sections of Plaintiff's submission as an ob-

jection to this court's referral of the summary judgment motions to Judge Bloom for a report and recommendation. Plaintiff outlines 28 U.S.C. § 636 and Federal Rule of Civil Procedure 73, quoting heavily from these authorities and case law regarding the scope of magistrate judge authority. (*See* Pl.'s Obj. at 1–6.) For example Plaintiff states that 28 U.S.C. § 636(b) "does NOT authorize a magistrate to enter final judgment." (Pl.'s Obj. at 2 (citing *Kendall v. Davis*, 569 F.2d 1330, 1330 (5th Cir.1978)).) Plaintiff also appears to argue that consent of the parties is required for a magistrate judge to consider a motion. (*See* Pl.'s Obj. at 4–5 ("Rule 73(b) of the Federal Rule[s] of Civil Procedure[ ] REQUIRE[S] that the parties execute and file a written consent form, also to protect the voluntariness of the parties' consent.")) (citing Fed. R. of Civ. P. 73(b) advisory committee note); *id.* at 5 ("[U]nder 636(c)(1), lack of consent and defects in the referral order are nonwaivable jurisdictional errors.") (quoting *Roell v. Withrow*, 538 U.S. 580, 580, 123 S.Ct. 1696, 155 L.Ed.2d 775 (2003) (syllabus)).

Although Plaintiff is generally correct in his statement of the law, he has focused on the wrong federal rule and subsection of § 636. Section 636(b)(1)(B) permits a magistrate judge to consider summary judgment motions and make "proposed findings of fact and recommendations" to the district court judge regarding their disposition.[5] Rule 72(b)(1) supports § 636(b), stating that "[a] magistrate judge must promptly conduct the required proceedings when assigned, *without the parties' consent*, to hear a pretrial matter dispositive of a claim . . . . The magistrate judge must enter a recommended disposition . . . ." Fed.R.Civ.P. 72(b)(1). As Plaintiff notes, these authorities do not empower a magistrate to enter final judgment or issue an order on a dispositive motion; rather they permit a magistrate to issue a *recommendation* to the district court judge regarding disposition. *See* 28 U.S.C. § 636(b)(1)(B). Referrals under this statute and the corresponding rule do not require party consent because the magistrate judge's report and recommendation is purely advisory. It does not have the force of an opinion or order of the court until adopted—or rejected or modified—by the district court, before which the parties have an opportunity to submit objections. *See id.* § 636(b)(1)(C). By contrast, consent of the parties is required for proceedings under § 636(c) and Rule 73, which authorize a magistrate judge to preside over entire civil actions, including conducting trial and ordering the entry of judg-

---

**5.** That subsection provides, in full:

[A] judge may also designate a magistrate judge to conduct hearings, including evidentiary hearings, and to *submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A),* of applications for posttrial relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.

28 U.S.C. § 636(b)(1)(B) (emphasis added). "[A]ny motion excepted in subparagraph (A)" refers to motions excluded from § 636(b)(1)(A), the subsection that permits magistrate judges to *determine* certain matters rather than only *recommend* disposition to the district court:

[A] judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, *except a motion* for injunctive relief, for judgment on the pleadings, *for summary judgment,* to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action.

*Id.* § 636(b)(1)(A) (emphasis added).

ment in a case. *See id.* § 636(c)(1); Fed. R.Civ.P. 73(a)-(b).

Here the court referred two dispositive motions to Judge Bloom "for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b)(1)." (Oct. 9, 2013, Order.) Judge Bloom issued the R & R, which provided certain recommendations to the court about the disposition of the motions. In his objections, Plaintiff cites they very subsection that governed this court's referral to Judge Bloom:

> As applicable here where the parties to this action, did NOT, through legal procedure, formally specifically consent to proceeding before the magistrate judge, see section 636(c)(1), the district court may designate a magistrate judge to consider various matters, *see section 636(b)* ..... While magistrates may hear dispositive motions, they may only make proposed findings of fact and recommendations, and district courts must make de novo determinations, (specifically here ... based on proper evaluation of the prima facie testimony and direct document evidence in the court record,) when a party objects to the magistrate's report and recommendation.[6]

(*See* Pl.'s Obj. at 4 (second ellipsis in original; emphasis added) (citing *First Union Mortg. Corp. v. Smith,* 229 F.3d 992, 995 (10th Cir.2000)).) The court has followed this procedure in referral of the motions and consideration herein of Plaintiff's objections. Therefore Plaintiff's objection is overruled.

### 2. *Statute of Limitations on Duty of Fair Representation Claim*

█ Plaintiff also objects to the R & R's conclusion that Plaintiff's duty of fair rep-

resentation claim is time-barred. Plaintiff points to the December 8, 2011, NYSDHR letter, confirming receipt of Plaintiff's request to dismiss his NYSDHR complaint and claims this letter advises of a longer statute of limitations. (Pl.'s Obj. at 9.) The letter states "[w]here a complaint is dismissed on the grounds that the election of remedies is annulled, any subsequent *Human Rights Law action* must be brought in *state court* within three years from the original date that the discrimination occurred." (Pl.'s Mar. 25, 2014, Ltr. (enclosing NYSDHR letter) (emphasis added).) The NYSDHR letter refers to a Human Rights Law action—a state law claim—brought in state court. Plaintiff's duty of fair representation claim is under federal law, and this action is in federal court. The six-month limitations period for a duty of fair representation claim is well-established under case law. *See DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 169, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) (holding that the six-month limitations period in section 10(b) of the NLRA applies to claims of breach of a union's duty of fair representation); *Beachum v. AWISCO N.Y.,* 785 F.Supp.2d 84, 100 (S.D.N.Y.2011) *aff'd sub nom. Beachum v. AWISCO N.Y. Corp.,* 459 Fed.Appx. 58 (2d Cir.2012) ("The statute of limitations on a duty of fair representation claim is six months ... [and] accrues when the union members know or reasonably should know that a breach of that duty has occurred."). A notice from a state agency that refers to state law claims cannot dictate or displace the established statute of limitations for Plaintiff's federal claim.

█ Since Plaintiff's duty of fair representation claim is time barred, he cannot

---

**6.** The court notes that a party must make objections to a *specific* portion of the magistrate's report and recommendation in order to obtain de novo review of that section. *See U.S. Flour,* 2012 WL 728227, at *2. Otherwise, Plaintiff's summary is correct.

maintain his Title VII and ADEA claims. "[I]n order to establish a violation of Title VII or the ADEA by [a labor organization, a plaintiff] would have to show, at a minimum, that the union breached its duty of fair representation and that its actions were motivated by discriminatory animus." *McIntyre v. Longwood Cent. Sch. Dist.,* 380 Fed.Appx. 44, 49 (2d Cir.2010) (summary order); *see also Klaper v. Cypress Hills Cemetery,* No. 10–CV–1811 (NGG), 2012 WL 959403, at *7 (E.D.N.Y. Mar. 21, 2012); *Beachum,* 785 F.Supp.2d at 103 ("Plaintiff cannot maintain a cause of action against a union under Title VII without a finding that the union breached its duty of fair representation.") Because Plaintiff cannot establish his duty of fair representation claim, as a matter of law, his Title VII and ADEA claims fail as well. Therefore Plaintiff's objection is overruled.[7]

### 3. *Plaintiff's Training by the Employer*

█ Plaintiff also objects to the R & R for failing to mention "the prima facie fact that the plaintiff was denied adequate proper training by the defendant employer." (Pl.'s Obj. at 8.) To support the fact that the employer promised to train Plaintiff and did not adequately do so, Plaintiff cites a letter from the employer's counsel to NYSDHR stating that Plaintiff was to be trained "for a one week period" when he was hired (Compl. at 143) and also cites an email from an employee—presumably a supervisor or manager—which references Plaintiff's five-gallon spill, and states that

"[Plaintiff] was not fully instructed on the use of this unit to open the middle compt first" (*id.* at 150).

Plaintiff is correct that this fact is missing from the R & R's background section. However, this fact relates to Plaintiff's claims against the employer, which are stayed due to the employer's filing for bankruptcy. The fact is not material to Plaintiff's claims against the union, which concern the union's alleged discrimination against and inadequate representation of Plaintiff at the grievance meeting. The exclusion of the fact of Plaintiff's insufficient training has no bearing on the R & R's analysis of Plaintiff's claims against the union. Therefore the objection is overruled.

### 4. *Incomplete Statement of Plaintiff's Complaint and Deposition Testimony*

█ Plaintiff also objects to the R & R on the grounds that it included only partial quotes from Plaintiff's Complaint and deposition transcript on various issues. (Pl.'s Obj. at 8.) The R & R stated "Roger Romance, the employer's safety manager approached plaintiff and told him that no one had ever pointed out the error and that he was 'hurting the company.'" (R & R at 404 (quoting Compl. at 28; Def.'s 56.1 Stmt. ¶ 55).) Plaintiff objects to the R & R's reference to "the error" as shorthand for the error in the company manual about truck unloading procedure, arguing that "the Magistrate's undetailed erroneously implicative statement of 'error' leads to erroneous presumptions."[8] (Pl.'s Obj. at

7. Due to the court's dismissal of Plaintiff's federal claims, the court declines to exercise jurisdiction over Plaintiff's pendent state law claims. To the extent that Plaintiff has viable claims against the union under New York Human Rights Law or other state law, he may bring them in state court. N.Y. C.P.L.R. § 205 permits Plaintiff to refile the pendent claims in state court within six months of the

date of termination of this action without regard to the original statute of limitations for those claims, so long as the claims would have been timely at the commencement of this action. *Tishman v. Associated Press,* No. 05–CV–4278 (GEL), 2007 WL 4145556, *9 (S.D.N.Y. Nov. 19, 2007).

8. In his Complaint, Plaintiff's full statement on this point was "Roger Romance said to

8.) Plaintiff lodges a similar objection regarding partial quoting of his deposition testimony in the R & R, which he claims did not make clear that his belief that the employer was concerned that Plaintiff had jeopardized a $43 million government grant was only speculation. (*Id.* at 8–9.)

The court has reviewed Plaintiff's Complaint and attachments, as well as the relevant portions of Plaintiff's deposition. The court is therefore aware of Plaintiff's statements in full and finds that the R & R's excerpts thereof do not misrepresent Plaintiff's words. This objection is meritless and is overruled.

5. *Reference to Plaintiff's Arrest Record*

Plaintiff objects to the R & R's reference to his "criminal record," and "asserts and maintains that he (Plaintiff) is NOT a criminal." (Pl.'s Obj. at 9.) This objection is frivolous. The R & R's sole reference to Plaintiff's arrest record is a sentence listing Plaintiff's state law claims, which include "discriminated against him on the basis of his criminal record." (R & R at 417.) Because the R & R recommends declining jurisdiction over Plaintiff's state law claims, it does not analyze this cause of action and makes no findings about Plaintiff's criminal history or lack thereof. Plaintiff is in no way prejudiced by the R & R's word choice as it had no bearing on the analysis. This objection is overruled.

**B. General Objections**

 Plaintiff also raises the following objection to the R & R:

The Magistrate's [sic] Judge's Report and Recommendation, (R & R) dated February 18, 2014, in part, lacks proper details of the prima facie facts of this case and is, in part, based on errors and misrepresentation of PRIMA FA-

CIE facts, and consequently errors in application of law. Moreover, factual evaluations accompanied by prima facie documented testimony, and prima facie direct document evidence, are determinations for a District court by a jury of Plaintiff's peers to determine the credibility thereof.

(Pl.'s Obj. at 8.) Because this objection is general, the court reviews the R & R for clear error. *Pall Corp.*, 249 F.R.D. at 51. Summary judgment is proper if "there is no genuine dispute as to any material fact." *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir.2011) (quoting Fed.R.Civ.P. 56(a)). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Not all facts that Plaintiff put forward in his filings are material to the legal findings in the R & R, in part because many facts relate only to the employer's liability. It was not improper for the R & R to ignore non-material facts or disputes thereof because they do not "affect the outcome" of the case against the union. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The court has reviewed the R & R and the "prima facie facts" in Plaintiff's Complaint and objections and finds no clear error in the R & R's consideration of the facts in the record.

**C. Remainder of the Report & Recommendations**

Portions of the R & R to which a party makes no objection are also reviewed for clear error. *U.S. Flour*, 2012 WL 728227, at *2. The court therefore reviews for clear error the portions of Judge Bloom's R & R that were not objected to and finds none. Accordingly, the court also adopts those portions of the R & R.

me, 'You are the only one that ever pointed out details in the written company policy you

know. That can hurt the company.' " (Compl. at 28.)

## IV. PLAINTIFF'S OTHER MOTIONS

### A. Motion For a Settlement Conference

▮▮▮ Plaintiff submitted two additional motions with his objections. One "request[s] a hearing to discuss a court mediated settlement proposal" and "request[s] that Christina Gallo be excluded as counsel/co-counsel to Defendant." (Mot. for Hr'g & to Disqualify Counsel at 1.) Plaintiff's motion relays recent settlement discussions he had with Ms. Gallo, counsel for the union. Although the parties came to an agreement generally, Plaintiff objected to the language of the draft settlement, and did not execute the agreement. He claims that the union's counsel "continues to attempt to deceive [him] by trickery, by attempting to have the plaintiff enter into a stipulation that could potentially perjure the plaintiff and/or cause the case to be 'Terminated' on a technicality." (*Id.* at 2.) Plaintiff requests that the court mediate a settlement. (*Id.*) The union submitted a letter in response, stating that it explained the settlement agreement to Plaintiff, removed certain language to which Plaintiff objected, and sent a draft to Plaintiff that had been signed by the union. (Def.'s Mar. 28, 2014, Ltr. (Dkt. 71).) The union has reservations about the likelihood of success of future negotiations with Plaintiff. (*Id.* at 2.)

The court declines to order a settlement conference at this late juncture in the case. During conferences before Judge Bloom, she encouraged the parties to discuss settlement. (June 12, 2012, Order (Dkt. 19); Sept. 7, 2012, Order (Dkt. 31).) Plaintiff was able to request settlement conferences during the two-year pendency of this case but waited until the brink of potential judgment against him to do so. Therefore Plaintiff's eleventh-hour motion for a settlement conference is DENIED.

### B. Motion to Disqualify Counsel

▮▮▮ Plaintiff also moved to disqualify Ms. Gallo based on her actions during settlement negotiations and her cohabitation with one of Judge Bloom's former law clerks. (Mot. for Hr'g & to Disqualify Counsel at 2.)

▮▮▮ "Disqualification is viewed with disfavor in this Circuit because it impinges on a 'client's right freely to choose his counsel.'" *Finkel v. Frattarelli Bros., Inc.,* 740 F.Supp.2d 368, 372 (E.D.N.Y. 2010) (quoting *Evans v. Artek Sys. Corp.,* 715 F.2d 788, 791 (2d Cir.1983)) (other citations and internal quotations marks omitted). Courts require that the party seeking disqualification meet a "high standard of proof." *Id.* (citing *Evans,* 715 F.2d at 791–92). The decision to disqualify an attorney is left to the discretion of the district court, which looks to the American Bar Association ("ABA") and state disciplinary rules for guidance. *Id.* (citing *Hempstead Video, Inc. v. Vill. of Valley Stream,* 409 F.3d 127, 132 (2d Cir.2005); *Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 72 (2d Cir.1990)).

Plaintiff's conclusory statements that Ms. Gallo attempted "deceive" and "trick[ ]" him during settlement discussions and that her continuing representation would "prejudice the parties" are unsupported by evidence. (Mot. for Hr'g & to Disqualify Counsel at 2.)

Plaintiff does not allege any violation of the ABA Model Rules of Professional Conduct, New York's Rules of Professional Conduct, or other ethics rules, and the court's review of correspondence from Ms. Gallo to Plaintiff and the attached draft settlement reveals none. Furthermore, the union's counsel previously disclosed to the court Ms. Gallo's relationship with Judge Bloom's then law clerk. (Def.'s May 22, 2012, Ltr. (Dkt. 15).) As Judge

Bloom noted in her subsequent Order, this was not grounds to disqualify Ms. Gallo, but as a precaution, the law clerk at issue was not permitted to work on this case. (May 24, 2012, Order (Dkt. 16).) Moreover, the law clerk is no longer working for Judge Bloom. Therefore Plaintiff's motion to disqualify Ms. Gallo is DENIED.

### C. Motion to Appoint Counsel

 Finally, Plaintiff renews his request for pro bono counsel. Plaintiff's prior requests for counsel were denied without prejudice by Judge Bloom. (*See* June 29, 2012, Order (Dkt. 22); Jan. 28, 2013, Order (Dkt. 45).) There is no right to counsel in a civil case. *Martin–Trigona v. Lavien,* 737 F.2d 1254, 1260 (2d Cir.1984). In considering whether to request that a volunteer attorney take the case, a court must first consider whether the case meets "a threshold showing of some likelihood of merit." *Johnston v. Genessee Cnty. Sheriff Maha,* 606 F.3d 39, 41 (2d Cir.2010). As this Order makes clear, Plaintiff's case does not meet this requirement. Therefore Plaintiff's motion is DENIED with prejudice.

## V. CONCLUSION

For the reasons set forth above, Judge Bloom's R & R is ADOPTED IN FULL. Defendant's motion for summary judgment is GRANTED on Plaintiff's federal claims. Plaintiff's state law claims are DISMISSED without prejudice. And Plaintiff's cross-motion for summary judgment is DENIED.

Plaintiff's motions for a settlement conference, disqualification of Christina Gallo,

and appointment of pro bono counsel are also DENIED.

SO ORDERED.

## REPORT AND RECOMMENDATION

BLOOM, United States Magistrate Judge.

Plaintiff Antonio Velasquez brings this *pro se* action alleging defendants, his employer and his union, discriminated against him based on his race, national origin, sex, and age and that his union failed to fairly represent him. Defendants Metro Fuel Oil Corporation and Apollo Petroleum Transport LLC, plaintiff's prior employer, filed for bankruptcy after this action was commenced. Therefore, this action is stayed against the employer. (ECF No. 40.) Defendant International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America (AFL–CIO) Local 553 (hereinafter "union") and plaintiff completed discovery; they now cross move for summary judgment pursuant to Fed. R.Civ.P. 56.[1] The Honorable Nicholas G. Garaufis referred the parties' cross-motions to me for a Report and Recommendation in accordance with 28 U.S.C. § 636(b). For the reasons set forth below, it is respectfully recommended that union's motion for summary judgment should be granted and plaintiff's motion for summary judgment should be denied.

### BACKGROUND

Plaintiff is a fuel oil truck driver with over 20 years of experience in the commercial transportation field. (Def.'s 56.1 Statement ¶ 17.) On December 15, 2008, plaintiff began working for Metro Fuel Oil Corporation and Apollo Petroleum Transport LLC (collectively, "employer"). (*Id.*

---

1. The union served plaintiff with the requisite notice regarding summary judgment pursuant to Local Rule 56.2. (ECF No. 59.)

¶ 9.) He then became a member of the defendant union. (Pl.'s 56.1 Statement ¶ 11; Def.'s 56.1 Statement ¶ 16.)

On December 29, 2008, plaintiff spilled approximately five gallons of fuel on a customer's driveway. (Def's 56.1 Statement ¶ 48.) Upon returning to work, plaintiff filled out a spill report and wrote down that he followed company procedure for unloading oil, but the truck assigned to him required a different unloading procedure. (*Id.* ¶ 52.) Specifically, the employer's manual stated drivers "must" unload the oil compartments starting from the back; however, unbeknownst to plaintiff, three of the employer's trucks, including the one he was assigned on December 29, 2008, required a different unloading order. (Compl. at 26–27.) In addition to filling out the spill report, plaintiff discussed how the employer's faulty instructions resulted in the spill with the shop steward Ken Orichio. (Def.'s Statement ¶ 53.) Plaintiff was disciplined with a verbal warning and was suspended without pay for one or two days. (*Id.* ¶ 49.)

Thereafter, the employer placed warning labels on the three trucks that required a different unloading order and edited the company manual. (Compl. at 27: Def.'s 56.1 Statement ¶ 54 [2].) Roger Romance, the employer's safety manager approached plaintiff and told him that no one had ever pointed out the error and that he was "hurting the company." (Compl. at 28, Def.'s 56.1 Statement ¶ 55.) According to plaintiff, the employer believed that the error in the manual jeopardized 43 million dollars "in a government grant. . . ." (Velasquez Dep. 172:2–173:2.) Plaintiff further alleges that in retaliation for his exposing the error in the manual, the employer instituted a campaign of scrutiny, shorted his pay, sabotaged him, harassed him, and ultimately terminated him. Plaintiff asserts the union was complicit in the employer's campaign against him and failed in its duty to fairly represent him.

*Pay Shortages*

After Roger Romance told plaintiff he was "hurting the company," the employer began to short plaintiff's pay, starting sporadically with an hour's pay, then shorting him an entire day's pay or overtime and holiday pay. (Def.'s 56.1 Statement ¶ 101.) Each time he was underpaid, plaintiff contacted the union's shop steward. (*Id.* ¶ 102.) Although plaintiff admits that after he spoke with the shop steward, his complaints were remedied and he received proper pay, he insists that it kept happening and he kept having to complain about the pay shortages. (Def.'s 56.1 Statement ¶ 104, Velasquez Dep. 171:11–25.[3])

2. Although plaintiff pleads this fact in his complaint and attaches the revised manual, *see* (Compl. at 27, 107), he inexplicably denies this fact in his Rule 56.1 Statement. (Pl.'s 56.1 Statement ¶ 54.)

3. According to plaintiff, other workers of "Indian and non-Indian descent" were also subjected to short payments, including holiday pay. (Def.'s 56.1 Statement ¶ 130, Compl. at 38.) At his deposition, plaintiff testified as follows:

Q: When you complained of short pay, did the employer then pay you?
A: After my complaints, yes, they would pay me. But it took them several days but

they kept doing it. Then they escalated into tapping into whole holiday pays.
Q: Did you raise your complaint of holiday pay?
A: Each and every time.
Q: How did you raise it?
A: I spoke with Kenny [the shop steward], and I called the Union, I believe, it was once before.
Q: When did you call the Union?
A: The first time I actually called the Union, I don't think I spoke to the Union about short pay directly. I spoke with [the shop steward] about the short pay every time it happened.
Q: Then you got paid?

Plaintiff also claims that the employer failed to increase his wages when the collective bargaining agreement ("CBA") was renewed on March 30, 2009. The union asserts, and plaintiff does not dispute, that since plaintiff was hired on or after March 1, 2007, the applicable provision of the CBA provides that he would be paid $2.00 per hour less than the experienced driver rate for his first year of employment and $.50 per hour less during his second year of employment. (Def.'s 56.1 Statement ¶ 108; Pl.'s 56.1 Statement ¶ 108.) Nonetheless, plaintiff believes he is entitled to a higher wage because the union's May 25, 2009 notice announcing the date for the vote on the new CBA indicated a specific wage increase. (Pl.'s 56.1 Statement ¶ 109 (citing Compl. at 102–103).)

*May 2009 Termination and Application for Unemployment Insurance*

In May 2009, the employer terminated plaintiff because he did not have a Transportation Worker Identification Credential ("TWIC") Card from the Transportation Security Administration ("TSA"). (Def.'s Rule 56.1 Statement ¶ 87.) At the time he was hired, plaintiff's application for a TWIC card was pending, and according to plaintiff, it was still pending at the time of his firing. (Pl.'s 56.1 Statement ¶ 84.) The employer offered to reinstate plaintiff once he obtained his TWIC card. (Def.'s 56.1 Statement ¶ 88.) Plaintiff contacted

the union and spoke with Jeanie Saunders, a union employee, who told plaintiff that "there was nothing the union could do for [him]," to "give the [TSA] hell" regarding his TWIC card application, and to "apply for welfare." (Pl.'s 56.1 Statement ¶ 90; Velasquez Dep. 179:1–10.)

While continuing to inquire with the TSA regarding his TWIC card, plaintiff applied for unemployment benefits. Plaintiff received unemployment benefits, but those benefits were suspended several times, including when the employer contested plaintiff's claim by falsely asserting that plaintiff had quit. (Pl.'s 56.1 Statement ¶ 95; Def.'s 56.1 Statement ¶ 94.) Plaintiff conferred with the shop steward regarding the employer's statement to the Unemployment Insurance Board. (Pl.'s 56.1 Statement ¶ 96.) [4]

After plaintiff received his TWIC card, he was rehired by defendant in September 2009, but had to fill out another application and go through another probationary period. (Velasquez Dep. 192–193; Pl.'s 56.1 Statement ¶ 98.) Although plaintiff was dissatisfied with the result of what he characterizes as collusion between the employer and the union, it is undisputed that the union and employer agreed to retain plaintiff's start date and pay scale, but placed him at the bottom of the seniority

---

A: Yes, after. But it kept happening. It was like an intimidation, which was part of the stress and anxiety factor .... (Velasquez Dep. 170:21–171:20.) Plaintiff acknowledges that "[a]fter Mr. Orichio spoke to the Employer, Plaintiffs complaints were remedied and he received proper pay" but he alleges that the employer continued to cheat him on his pay, the shop steward grew resentful of having to address his complaints, and the union eventually sided with the employer, who "only remedied some of his underpayments." (Pl.'s 56.1 Statement ¶¶ 103, 104, 106.)

4. The union states that "plaintiff did not inform it about any problems with his receipt of unemployment insurance until after" his January 2010 termination, but it is clear in the deposition testimony cited by the union, that plaintiff only admitted that he did not show the president of the union, Jack Dresch, his unemployment insurance documentation until the day of the grievance meeting. *Cf.* (Def.'s 56.1 Statement ¶ 96) with (Velasquez Dep. 228–29).

list upon his re-hiring. (Def.'s 56.1 Statement ¶ 99; Pl.'s 56.1 Statement ¶ 98 [5].)

*Truck Sabotage and Harassment*

Plaintiff also alleges his employer sabotaged his delivery truck. For example, during the course of one delivery, plaintiff noticed oil coming from the back of his vehicle. (Compl. at 42.) The Yonkers Fire Department, whom plaintiff called regarding the spill, "de[emed] the incident a mechanical safety deficiency." (*Id.*) On another occasion, plaintiff alleges that someone hacksawed through his gear shaft. (*Id.* at 44.) Plaintiff discovered the defect while driving but coasted to a stop where a service worker temporarily fixed his stick shift. Plaintiff drove the truck to the service shop, where stick shift was welded back together. (*Id.* at 45.) On another occasion, plaintiff discovered that the main delivery hose of his truck was "charged with" so much air that had he not checked and relieved the pressure as required in his pre-trip inspection procedures, the "cast aluminum cap ... would had flown off with the force of a deadly projectile." (*Id.* at 46.) Finally, on four occasions, plaintiff was sent to a delivery location with insufficient space for his truck, forcing him to park very close to the curb on a two way street, placing his truck at serious risk of rollover. (*Id.* at 47.) Plaintiff communicated his safety concerns to a manager, Scott Alnswick ("Alnswick"), and the shop steward but alleges that "there was obviously a code of silence in the company when matters pertained to

serious safety sensitive issues." (*Id.* at 48.)

Plaintiff also states that he was "harassed several times and intimidated verbally and physically." (*Id.* at 29.) The only harassment alleged-beyond that detailed in other sections of this Report and Recommendation—is that plaintiff was given work that "exceeded the allowable daily maximum hours of operation by a commercial truck driver," and that when he complained about his workload, he was told to "shut up" and that he was "complaining too much." (*Id.*) Plaintiff complained about this mistreatment to the shop steward, who, on at least one occasion, angrily told plaintiff, "No one here is out to get you!" (Def.'s 56.1 Statement ¶ 119, Compl. at 77.)

*Discrimination*

Plaintiff also alleges he suffered discrimination at work. One of the employees called plaintiff a racial epithet: after plaintiff reported a missing access card, Alnswick responded, "Did you look for it in the crack of your ass? You stupic spi[c]!" (Compl. at 38–39, Def.'s 56.1 Statement ¶ 125.) [6] Plaintiff did not report this statement to the union. (Def.'s 56.1 Statement ¶ 128). Plaintiff found several other incidents suspicious "based on [the individuals'] mental and physical demeanors." (Velasquez Dep. 172:18–21; Pl.'s 56.1 Statement ¶ 129.) Plaintiffs allegations regarding other discriminatory incidents are

---

**5.** Both parties rely on a September 22, 2009 email between Anthony Peretta and Roger Romance, that states that "[o]ur agreement with the Union was that his date of hire— **12/15/2008 will remain in effect**, but that he would go to the bottom of the seniority list, making the same scale of wages that he did when he was laid down." (Def.'s 56.1 Statement ¶ 99 and Pl.'s 56.1 Statement ¶ (both citing Compl. at 152) (emphasis in original).)

**6.** Although the union claims that this was "the only incident where [plaintiff] believed that he was discriminated against on the basis of his identity as "Hispanic American" and his "international heritage," (Def.'s 56.1 Statement ¶ 129), plaintiff testified during his deposition that the epithet was the only racially discriminatory verbal comment but there were "other incidents" of discrimination. (Velasquez Dep. 5–21.)

unclear.[7]

However, during his deposition, plaintiff stated that one suspicious incident occurred "when I finally received my TWIC card." (Velasquez Dep. 173:21–22.) After he received his TWIC card, Roger Romance "didn't even say congratulations. They didn't say welcome back ... They were just pretty displeased at the fact that [I] got my TWIC card." (Velasquez Dep. 192–193.) In addition, a rubber rat with a rat trap was placed in the employee locker room but plaintiff testified that he "didn't think nothing of that" at the time. (Def.'s 56.1 Statement ¶¶ 131–32.) However, when "other incidents happened" "it became very apparent" to plaintiff that the employer wanted him out of the company because plaintiff pointed out the error in the written manual. (Velasquez Dep. 167:23–169:3, 166:19–25 ("Roger Romance adopted an idea that I was trying to hurt the company, and that is where all the subsequent retaliation acts and action commenced and procedures for the duration of the year until I was terminated the second time.") In fact, several times during his deposition, plaintiff disavowed any invidious discrimination, insisting that his complaint alleged race, color, national origin, sex, and age-based discrimination because he did not know why the union and employer "were doing what they were doing against me.... I later learned that it had to do with the spill complaint that I filled out." (Def.'s 56.1 Statement ¶ 134).) In opposing the instant motion, plaintiff now "partially admits" this testimony but states that Kenny Orichio, who is Italian American, was responsible for a thousand gallon oil spill but nevertheless was made shop steward by the union. (Pl.'s 56.1 Statement ¶ 143.)

*Plaintiff's January 2010 Termination*

In the "busy cold season" of 2010, plaintiff was assigned a heavy workload. (Def.'s 56.1 Statement ¶ 100, Compl. at 24.) On January 12, 2010, plaintiff, saddled with numerous deliveries, delivered approximately 350 gallons of fuel to the wrong address. (Def.'s 56.1 Statement ¶ 57.) The fuel that plaintiff delivered was incompatible with the building's fuel grade requirements. (Compl. at 51 ("I later learned that the 350 gallons of # 4 oil had erroneously delivered to a # 2 oil residential facility, by none other than myself."))

7. When asked during his deposition to identify "concrete examples" of discrimination, plaintiff stated, "I told you, I am objecting to all of these questions, man ... All this information [counsel] is asking for is in the case file record, and [counsel] is asking me to be specific with dates, times, and locations, and incidents.... And ... I have already proven my case based on your sworn answers, and statements, and responses." (Def.'s 56.1 Statement ¶ 122.) When asked again "What are the acts that you allege were done to you?" plaintiff responded, "discrimination and retaliation." (*Id.* ¶ 123.) When further queried, plaintiff stated, "Sir, sir. I don't recall specific dates and times of the acts. You are talking about specificity here. I don't recall the specific dates and times of the acts." (*Id.* ¶ 124.) In opposing defendant's motion for summary judgment, plaintiff claims counsel's questions aggravated his "serious medical condition that triggers severe incapacitating pain." (Pl.'s 56.1 Statement ¶ 120.) More specifically, plaintiff claims that the union's counsel:

> Mr. [W]olf used futile ravaging wolf tactics, by the tossing of papers at me with his threatening facial expressions. Mr. Wolf, deviously used diabolical tactic (sic) while striving to maintain a normal audio vocal audio. Indeed, Mr. Wolf is a professional lawyer in his related field of work, and based on the plaintiff's Prima Facie Evidence over all, Mr. [W]olf may as well be looking for another job. William K. Wolf, even stooped to his all time low, by stating that the 'plaintiff is fearful of preying wolves,' Although he (Mr. Wolf) did not lie when he truthfully stated that I ... stated during the deposition that 'Christ, Jesus ... knows how to deal with wolves.'

(*Id.* ¶ 123.)

Plaintiff admits that he did not follow the procedures when making the delivery, did not report the incident as required, and did not otherwise follow the employer's policies and procedures, including sticking the tank and/or checking the meter or gauge. (Def.'s 56.1 Statement ¶ 60.) [8] After realizing that he made the delivery to the wrong address, plaintiff went to the correct customer's address and delivered the remainder of the fuel. (Def.'s 56.1 Statement ¶ 61.) It was not until he was en route to his next customer, which plaintiff admits was "a while" after the erroneous delivery, that he called his employer to report the incident, whereupon he was instructed to return to the location of the wrong delivery. (*Id.*) The employer claims it had to pump out the contents of that building's fuel tank and replace it with the proper grade fuel, which cost about $8,000. (Velasquez Dep. at 210:6–14; 212:6–12.) Although it was not an actual spill, the employer made plaintiff fill out another spill report. (Def.'s 56.1 Statement ¶ 62.)

The next day, in the presence of the shop steward, Roger Romance fired plaintiff. (*Id.* ¶¶ 65–66.) Plaintiff immediately asked the shop steward to grieve the termination. The shop steward said, "No, there is no way you will win a grievance arbitration Tony;" and, plaintiff responded that he disagreed because he "had evidence that the employer lied about [him]

to the Labor Board." (Compl. at 55.) After plaintiff went home, he called the union and the union set up a meeting with plaintiff and the employer. (*Id.*)

On January 26, 2010, immediately prior to the grievance meeting, plaintiff described his complaints to the union president John Dresch. (Pl.'s 56.1 Statement ¶ 74, Compl. at 56.) Plaintiff, Dresch, Mr. Orichio (the shop steward), Mr. Romance (the employer's safety manager); and, Anthony Peretta (a senior manager of the employer), attended the grievance meeting. (Def.'s 56.1 Statement ¶ 72.) After "about ten seconds" of "total silence," plaintiff asked Dresch if he was going to speak but Dresch told plaintiff, "No, you speak." (Compl. at 57, Pl.'s 56.1 Statement ¶ 74.) [9] Plaintiff spoke about his qualifications and the employer's mistreatment of him, including how the employer underpaid him, lied to the Unemployment Insurance Board, and sabotaged his vehicle. (Def.'s 56.1 Statement ¶ 75.) Plaintiff detailed other safety incidents and how he had to continue to complain about short wage payments. (Compl. at 58.) He "reminded Mr. Peretta that [he] was working under what [he] ultimately identif[ied] as deliberately imposed difficult work conditions." (*Id.* at 57.) Peretta interrupted and stated, "Let's not forget the reason we are here today, the reason being that you

---

8. Plaintiff only takes issue with how the union characterizes his reporting of the incident. He states that he reported the wrong delivery "at the time the plaintiff deemed [it] safe and appropriate." (Pl.'s 56.1 Statement ¶ 60.)

9. The union states that "[a]t the meeting, Mr. Dresch gave Plaintiff the opportunity to speak first." (Def.'s 56.1 Statement ¶ 74). The union points to plaintiff's deposition testimony:

Q: Who spoke first at the meeting? Did the employer? Was it Roger Romance?
A: I was told to speak. And when we went in, we all sat down, and nobody said anything. It was like a moment of silence.

And I turned to [Dresch], who was to my right, and asked him, "Are you going to say anything?" And he says, "Speak." He says, "No, you speak." And I turned to Tony Peretta, and without saying a word Tony Peretta said, "Speak." So, I spoke. I told them about the incidents I was complaining about.

(Velasquez Dep. at 225:24–226:13.) The union also cites to the employer's letter to plaintiff dated January 26, 2010 which states that "[a]t the beginning of the meeting Antonio, elected to speak on his behalf, ..." (Compl. at 156).

caused the company $8,000 in damages to the company, and we are here to discuss the actual termination." (Velasquez Dep. at 232:10–15.) Plaintiff offered to pay the company in weekly installments. (*Id.* at 17–22.) According to plaintiff's deposition:

A: [The shop steward] said it is illegal. Then, I turned to Tony Peretta again, and I asked him, "Am I going to be reinstated?" He said, "No. Not by me." At that point I knew that they were there to deny me due process. So I left. I left the meeting.

Q: So you walked out of the meeting?

A: I walked out of the meeting, yes. Because it was obvious what they were doing.

Q: And you were angry, right?

A: No, I wasn't angry. I was disappointed, sir. I was disappointed with the fact that everything they did prior to that meeting went unaddressed by the supervisors and the Union that I belonged to. That was part of—the Union and the company, I was part of the team. Okay? But they won't have me. So they did what they did. And it is in the record. Okay?

Q: And you walked out of that meeting?

A: I walked out of the meeting because it was painful knowing what they were doing. I have a condition. At that point, I was stricken with pain . . . . And I am trying to explain something that is true, and no one listens.

Q: Did you tell anyone that you were having pain or discomfort?

A: No, I didn't specify that.

(Velasquez Dep. 232–234.) [10] Two days later, on January 28, 2010, plaintiff filed a complaint with the New York State Division of Human Rights (NYSDHR) against the employer and union alleging discrimination and retaliation. (Compl. at 59, 12.) On or about June 1, 2010, plaintiff requested assistance by phone and mail from the International Brotherhood of Teamsters in Washington D.C. ("IBT") because the union "was in affiliation with them." (Velasquez Dep. at 235; Compl. at 59) He received a letter stating that IBT would look into the matter, but received no further communication from IBT. (*Id.* at 236:3–10.) Plaintiff admits that he did not contact the local union after the meeting because "[he] got tired of contacting them and they were doing absolutely nothing about it." (Velasquez Dep. 236:15–23.)

In opposition to the instant motion, and also attached to his complaint, plaintiff submits a page from the employer's disciplinary policy entitled "Wrong Delivery Disciplinary Policy," which provides that the driver's record dating back one year will be taken into consideration in determining discipline and that the first preventable delivery would be punished by a "[w]ritten warning determined by the severity of the wrong delivery." (Compl. at 106.) [11]

---

**10.** Plaintiff's complaint alleges that after Peretta said he would not re-hire him, plaintiff, "feeling overwhelmed and unable to breath[e], . . . subconsciously walked out and went home, as Peretta claimed that his cam[e]ras revealed nothing, that I claimed happened." (Compl. at 58.) In opposing the instant motion, plaintiff states that "[d]efendants were videotaping the so-called 'grievance meeting' and were there to humiliate, deprive and further injure the plaintiff by their malicious tactics and methods. . . ." (Pl.'s 56.1 Statement ¶ 80.)

**11.** The policy reads:

**WRONG DELIVERY DISCIPLINARY POLICY**

1. Disciplinary action will be taken based on a decision by the Operations Department that a wrong delivery was preventable.
2. For the purpose of discipline, a driver's record dating back one (1) year from the

*Procedural History*

Plaintiff's January 28, 2010 complaint to the NYSDHR alleged that Roger Romance, Scott Alnswick, and "Jack" from Local 553 discriminated against him. (*Id.* at 12.) He alleged the employer opposed his unemployment insurance, unlawfully terminated him twice, and shorted his pay. Plaintiff complains that after he filed a complaint with NYSDHR and the EEOC against a previous employer (a non-party) in 2007, he was fired "4 times in 2 years." (*Id.* at 13.) He also claimed the union "failed to render due process" at the January 26, 2010 meeting. (*Id.* at 15.)

On or about July 7, 2010, plaintiff also filed a charge with the National Labor Relations Board (NLRB). (*Id.* at 23–60.) After noting that the employer could prove plaintiff made a wrong delivery causing substantial monetary damages, the NLRB dismissed plaintiff's charge on the grounds that the union "is able to show that its decision not to pursue your discharge grievance, or your claim regarding contractual wages, was not outside the bounds of the discretion the law allows." (*Id.* at 159 (NLRB Decision, dated August 26, 2010).) Plaintiff's appeal of this decision was also denied, on the grounds that plaintiff failed to meet his burden that the union failed to fairly represent him. (Compl. at 162 (Regional Director's Decision, dated January 18, 2011).) In denying his appeal, the Regional Director reasoned that "it appears that the Union based its decision on its assessment of its chances of being successful on your behalf and that "as to [plaintiff's] contractual issues, the fact that you may interpret the contract one way and the Union another does not establish the Union has breached its duty of fair representation where, as here, its interpretation of the contract was reasonable and there is no evidence of unlawful considerations." (*Id.*)

Plaintiff successfully dismissed his NYSDHR complaint and annulled the election of remedies; the EEOC issued plaintiff a Right to Sue letter on February 6, 2012. (Compl. at 10, 18, 22, 61.) Plaintiff filed the instant complaint on March 29, 2012, alleging defendants violated his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq* and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, by terminating him, setting unequal terms and conditions of employment, and retaliating against him. (*Id.* at 3.) Plaintiff's complaint also alleges claims of "intentional [infliction] of emotional distress, breach of contracts, harassment, intimidation, discrimination, verbal abuse, libel, slander, and denial of due process of law." (*Id.*) The complaint states that the discrimination was based on his race (Hispanic American), color ("International Heritage"), sex, and age (48). (*Id.*)

## DISCUSSION

### I. Standard of Review

"Summary judgment is proper only when, construing the evidence in the light

most recent occurrence will be taken into consideration to determine the severity of discipline.

3. The following steps will be followed in determining the severity of discipline for a wrong delivery.

a. *First Preventable Wrong Delivery*
 Written warning determined by the severity of the wrong delivery.
 The factors contributing to the wrong delivery will be reviewed and investigated.

b. *Second Preventable Wrong Delivery*
 One or two day suspension. The factors contributing to the wrong delivery will be reviewed and investigated.

c. *Third Preventable Wrong Delivery*
 Possible termination. Written letter will include summary of events leading to discharge. 5[sic]. In the case of a preventable wrong delivery that causes a fuel spill, steps 3.a and 3.b. will be bypassed and the wrong delivery will result in termination.

most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Doninger v. Niehoff,* 642 F.3d 334, 344 (2d Cir.2011) (quoting Fed.R.Civ.P. 56(a)). A fact is material if it is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir.2007) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir.2000); *see also Baker v. Home Depot,* 445 F.3d 541, 543 (2d Cir.2006) (resolving all ambiguities and drawing all inferences in favor of the nonmoving party on summary judgment).

However, the non-moving party must provide "affirmative evidence" from which a jury could return a verdict in its favor. *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 175 (2d Cir.2003) (quoting *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998)). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Id.* (quoting

*Anderson,* 477 U.S. at 252, 106 S.Ct. 2505). Here, because plaintiff is proceeding pro se, the Court "reads his papers liberally and interpret[s] them to raise the strongest arguments that they suggest." *Brownell v. Krom,* 446 F.3d 305, 310 (2d Cir. 2006) (quoting *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)) (internal quotations omitted).

## II. Duty of Fair Representation

■■■■ Plaintiff claims the union denied him due process of law. (Compl. at 15, 78.) However, "the United States Constitution regulates only the Government, not private parties," and labor unions such as defendant "are not state actors." *Ciambriello v. County of Nassau,* 292 F.3d 307, 323 (2d Cir.2002). Therefore, plaintiff cannot state a claim for a denial of due process by the union, a private, non-state entity. *Id.* Therefore, the Court liberally construes plaintiff's complaint as alleging that defendant violated his rights under the union's duty of fair representation.

■■■■ "An employee's claim against a union for breaching its duty of fair representation (a 'DFR claim') is a cause of action 'implied under the scheme' of the National Labor Relations Act ('NLRA'), 29 U.S.C. § 151–169." *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Institute of Tech., Inc.,* 742 F.3d 42, 46 (2d Cir. 2014).[12] To prevail on this claim, plaintiff must demonstrate (1) "that the union's actions or inactions are either arbitrary, discriminatory, or in bad faith" and (2) "a causal connection between the union's wrongful conduct and [his] injuries." *Vaughn v. Air Line Pilots Ass'n, Int'l,* 604 F.3d 703, 709 (2d Cir.2010).

---

**12.** The Clerk of Court is directed to send plaintiff the attached copies of the unreported cases cited herein.

■ The union acts arbitrarily "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991) (internal quotation omitted). To demonstrate bad faith, plaintiff must show that the union's actions constitute "fraud, deceitful action or dishonest conduct." *Nicholls v. Brookdale Univ. Hosp. & Med. Ctr.*, No. 05–CV–2666(JBW), 2005 WL 1661093, at *7 (E.D.N.Y. July 14, 2005) (citing *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emp. v. Lockridge*, 403 U.S. 274, 299, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971)). "A union's acts are discriminatory when substantial evidence indicates that it engaged in discrimination that was intentional, severe, and unrelated to legitimate union objectives." *Vaughn*, 604 F.3d at 709–710 (citation omitted).

■ In the context of claims that a union failed to file a grievance on a member's behalf, a union "may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion." *Vaca v. Sipes*, 386 U.S. 171, 191, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). However, "the union has the discretion to refuse to pursue claims which it believes are without merit." *Ayazi v. United Fed'n of Teachers, Local 2*, NO. 99 CV 9222(CLP), 2011 WL 888053, at *15 (E.D.N.Y. Mar. 14, 2011) (internal quotation omitted). It is clear that "the duty of fair representation is not breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance." *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1153–1154 (2d Cir.1994). The Court's review of a union's representation is therefore "highly deferential, recognizing the wide latitude that unions need for the effective performance of their bargaining responsibilities." *Vaughn*, 604 F.3d at 709 (internal quotation marks and citations omitted).

### A. *Any DFR Claim is Time-barred*

■ "[T]he limitations period for filing [a DFR] claim in the district court is borrowed from section 10(b) of the NLRA, 29 U.S.C. § 160(b), which provides for a six-month limitations period." *Kalyanaram*, 742 F.3d at 46. *See also Eatz v. DME Unit of Local Union No. 3 of I.B.E.W.*, 794 F.2d 29, 33 (2d Cir.1986) ("the § 10(b) six-month limitations period ... [applies] to unfair representation claims standing alone"). "[T]he cause of action accrues no later than the time when plaintiff[ ] *knew* or reasonably *should have known* that such a breach of the duty of fair representation had occurred, even if some possibility of nonjudicial enforcement remained." *Id.* (emphasis in original). Here, plaintiff raised his DFR claim in his January 28, 2010 NYSHDR charge and his July 7, 2010 unfair labor charge with the NLRB. Plaintiff's "NLRB charge establishes that he had actual knowledge of the breach" by July 7, 2010. *Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 55 (2d Cir.2003). Since plaintiff did not file the instant lawsuit until March 29, 2012, any DFR claim is time-barred and should be dismissed.[13] Even if

---

13. The six-month statute of limitations would also bar any hybrid § 301/fair representation claim, which requires an allegation that the employer breached the CBA and that the union breached its duty of fair representation. *Carrion v. Enter. Ass'n, Metal Trades Branch Local Union*, 227 F.3d 29, 33 (2d Cir.2000) (discussing hybrid claims under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 and NLRA, 29 U.S.C. § 151.) The Court also notes that "NLRB proceedings do not toll the six-month statute of limitations

plaintiff's DFR claim against the union was not time-barred, the Court should grant defendant's motion for summary judgment on plaintiff's DFR claim for the reasons stated below.

B. *Duration of Plaintiff's Employment*

▓▓▓▓▓ Based on the record evidence, no reasonable jury could find that the union breached its duty of fair representation regarding plaintiff's pay shortages, his May 2009 termination, or his claims of truck sabotage and discrimination. First, regarding the pay shortages, plaintiff testified at his deposition that every time he was underpaid, he contacted the union and he was then properly paid. (Def. 56.1 Statement ¶ 104.) Plaintiff cannot create an issue of fact by simply denying his testimony that the employer did not rectify all pay shortages. See *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir.1997) ("a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony"); *Soto v. GMRI, Inc.*, No. 11 CV 3187(ARR), 2013 WL 3208271, at *1 n. 1 (E.D.N.Y. June 24, 2013) (disregarding affidavit to the extent it contradicted deposition testimony). To the extent plaintiff is dissatisfied that the union did not prevent the recurrence of these pay shortages, this amounts to a claim that the union's "representation was not aggressive enough," which does not "rise to a breach of the duty of fair representation." *Mazza v. Dist. Council of N.Y.*, No. 00–CV–6854(BMC), 2007 WL 2668116, at *12 (E.D.N.Y. Sept. 6, 2007). Further, plaintiff had no right to a higher wage under the renewed CBA, a fact which plaintiff admits. As the union successfully pursued each of plaintiff's claims of underpayment and plaintiff admits that he received the correct wage under the CBA, plaintiff cannot demonstrate that he was injured by the union's conduct regarding his pay.

Second, the undisputed evidence shows that the union negotiated for plaintiff to be re-hired at his same pay scale and with the same start date after he obtained his TWIC card in 2009.[14] Even though plaintiff was placed at the bottom of the seniority list and had to go through another probationary period, the terms of plaintiff's re-hiring fell well within the "wide range of reasonableness" afforded to unions. *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 237 F.3d 174, 179 (2d Cir.2001). *See also Gonzalez v. New York City Transit Auth.*, No. 07 CV 4823(RJD), 2010 WL 3926872, at *7 (E.D.N.Y. Sept. 30, 2010) (no breach of duty of fair representation where, due to the union's representation, "plaintiff was essentially a winner").[15]

applicable to this action." *Ode v. Terence Cardinal Cooke (HCC)*, No. 08 Civ. 1528(SHS), 2008 WL 5262421, at *3 (S.D.N.Y. Dec. 12, 2008). *See generally, Kalyanaram*, 742 F.3d at 49 (plaintiff's pursuit of "a parallel avenue of relief to his DFR claim ... did not toll the applicable statute of limitations period") (internal quotation marks omitted).

14. The union's decision not to grieve plaintiff's May 2009 termination was reasonable. The TWIC card is required by the TSA and even plaintiff agrees that a TWIC card should be required for drivers of hazardous materi-

als. (Velasquez Dep. at 177:3–10 ("This new implementation took effect, because of the 9/11 incident, which I agreed with. I am totally for it.... I am part of the national security whether you realize it or not."))

15. To the extent plaintiff alleges the union should have challenged the employer's statement to the Unemployment Insurance Board mat he had quit, plaintiff can prove no injury since he was ultimately awarded unemployment insurance when the employer failed to appear at the hearing. (Def.'s 56.1 Statement ¶ 95.)

Third, plaintiff cannot show that the union breached its duty of fair representation regarding the alleged truck "sabotage." Plaintiff was able to immediately get his stick shift fixed, discharge the compressed air in his truck's main hose, and successfully complete several deliveries on the precarious two-way street-all without injury to himself or others. None of the incidents resulted in any disciplinary or other adverse employment actions against plaintiff. The union cannot be faulted for failing to pursue plaintiff's claims that the employer created these risky situations that did not harm anyone and were remedied immediately.

Likewise, there is also no evidence from which a reasonable jury could find that the union violated its duty of fair representation regarding the alleged harassment. First, with regards to the racial epithet by Alnswick, plaintiff admits he never reported it to the union. (Def.'s 56.1 Statement ¶ 128.) Since plaintiff failed to notify the union, he cannot claim the union ignored him or failed to fairly represent him regarding this comment. *See Ayazi*, 2011 WL 888053, at *20 (denying duty of fair representation where there was no "evidence that she informed the union of [her] request and was therefore ignored by the Union"); *Yarde v. Good Samaritan Hosp.*, 360 F.Supp.2d 552, 566 (S.D.N.Y.2005) (same where plaintiff failed to raise racial discrimination claim with union). Similarly, there is no evidence that the union acted arbitrarily, discriminatorily, or in bad faith regarding plaintiff's termination or re-hiring for his TWIC card, when supervisors told plaintiff to "shut up" because he was complaining too much, or when a rubber rat was placed in the locker room, an event which plaintiff thought "nothing" of. (Def.'s 56.1 Statement ¶¶ 131–32.) The union is not required to pursue grievances regarding civility in the workplace or incidents inconsequential to

plaintiff-and there would be no breach even if the union were negligent in evaluating the severity of any of these incidents. *See Cruz*, 34 F.3d at 1153–1154 (no breach of duty of fair representation where union "fails to process a grievance due to error in evaluating the merits of the grievance").

As there is no evidence from which a jury could find the union violated its duty of fair representation for the duration of plaintiff's employment until his January 2010 termination, defendant's motion for summary judgment regarding these claims should be granted.

### C. *Plaintiff's 2010 Termination*

■ Defendant's motion for summary judgment regarding plaintiff's January 2010 termination is three-fold: (a) the grievance lacked merit, (b) despite this fact and plaintiff's previous performance problems, the union set up a meeting with the employer to grieve the termination, and (c) the union declined to pursue the grievance after plaintiff left the meeting and abandoned the union's efforts to save his job. Drawing all inferences in plaintiff's favor, no reasonable juror could conclude that the union's conduct in this case was outside the wide range of reasonableness afforded by the law. Accordingly, defendant's motion for summary judgment regarding plaintiff's 2010 termination should be granted.

Defendant argues that plaintiff's grievance regarding his January 2010 termination lacked merit because, as plaintiff concedes, he made a wrong delivery of 350 gallons of oil, failed to check the tank's meter or gauge before delivery in the manner required by the employer, and failed to immediately report the erroneous delivery. These errors were compounded by plaintiff's disciplinary history for his failure to timely obtain a TWIC card and the December 2008 five-gallon spill. In addition,

plaintiff, who was fired by three other fuel oil companies in the two years before the employer hired him, lost one of those jobs because of an erroneous delivery but wrote on his employment application that he left that job because of "night shift inconvenience." (Velasquez Dep. at Ex. 4, Pl.'s 56.1 Statement ¶ 43 (a supervisor "made a very threatening eye contact with me . . . [w]hich is the reason why I wrote on [my employment application] that I deemed my employment with Island Transportation an adverse employment, 'night shift inconvenience.' "))

■ In response, plaintiff argues that his "operating record and overall proficiency record in [his] related field of work, proves that the Plaintiff maintained his safety priorities throughout his career." (Pl.'s 56.1 Statement ¶ 59.) He also points to the employer's gradual disciplinary policy for wrong deliveries, *see supra* at n. 11, and states that the union did not address this policy. Liberally construed, plaintiff argues that the union should have used the wrong delivery disciplinary policy to challenge his termination. Nonetheless, "[i]n the grievance context, tactical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach." *Castro v. 32BJ Union,* 800 F.Supp.2d 586, 593 (S.D.N.Y.2011) (internal quotation marks and citation omitted). Therefore, even if the union was negligent for not raising this argument or for evaluating the grievance as lacking merit, plaintiff presents no evidence that the union breached its duty of fair representation.

Defendant also argues that it did not breach its duty of fair representation, because notwithstanding the weakness of plaintiff's grievance, it set up a grievance meeting, during which it "gave plaintiff the opportunity to speak first," which plaintiff "squandered" by being "belligerent, unprofessional, and uncooperative." (Def.'s 56.1 Statement ¶¶ 74, 76; Def.'s Mem. of Law at 7–8.) Although plaintiff does not contest that the union set up the grievance meeting,[16] he disputes that he was belligerent and that the union "gave" him an opportunity to speak first. Rather, he alleges that the union representative outright refused to speak on his behalf and instead sided with the employer and left plaintiff to advocate for himself.

As an initial matter, the Court notes that the union's decision that plaintiff's grievance lacked merit was well within the reasonable discretion afforded to unions. *See supra* at 407 (the shop steward denied plaintiff's request to grieve his termination by stating, "No, there is no way you will win a grievance arbitration"). *Cf. Mazza,* 2007 WL 2668116, at *11 ("where the Union investigates a member's claim and reasonably determines that it is either meritless or simply unwinnable, it has satisfied its duty"). Although the union was not required to set up the meeting, construed in the light most favorable to plaintiff, the Court does not condone the union's failure to provide an opening statement or at least prepare plaintiff that he would be speaking and how he should approach the meeting-especially given the tenor of the relationship between plaintiff and the employer.[17] Of course, "[i]n hindsight, any decision a

16. Plaintiff points out that the CBA provides that the union must challenge a discharge within five days thereof and that his grievance meeting did not take place until January 26, 2010. (Pl.'s 56.1 Statement ¶ 69.) However, there is no allegation or evidence in the record that the employer challenged the timeli-

ness of the grievance meeting. Therefore, plaintiff cannot show any injury from any purported delay in scheduling the grievance meeting.

17. While the parties dispute exactly what happened at the January 26, 2010 meeting, what is clear from the record is plaintiff's dissatis-

union makes in the informal yet complex process of handling its members' grievances may appear to the losing employee to have been erroneous." *Barr v. United Parcel Serv.*, 868 F.2d 36, 43–44 (2d Cir. 1989). Nonetheless, on the instant record, the fact that plaintiff was not prepared for the meeting and was told to speak by the union simply could not meet the high bar of establishing arbitrary, discriminatory, or bad faith conduct. Thus, plaintiff presents no evidence that the union's failure to speak on his behalf at the start of the meeting amounted to bad faith or to "conduct and omissions so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary." *Tucker v. Am. Bldg. Maint.*, 451 F.Supp.2d 591, 596 (S.D.N.Y.2006) (citation and internal quotation marks omitted).

■■■■ Moreover, "[e]ven where the union's actions are arbitrary, discriminatory, or in bad faith, a cause of action for breach of the duty of fair representation only lies where the union's action seriously undermined the arbitral process." *Beachum v. AWISCO New York*, 785 F.Supp.2d 84, 101 (S.D.N.Y.2011) (quoting *Barr*, 868 F.2d at 43). Here, plaintiff admits he got up and left the meeting because he was "disappointed" and never contacted defendant union again, see (Velasquez Dep. 232–234; 236:15–23); instead 48 hours later, he filed a charge with the NYSDHR against the union and the employer and four months later, contacted the IBT and filed a charge with the NLRB. (*Id.* 235:14–18; 237:2–15.) Therefore, "any assertion that [the union's actions or inaction] had a negative impact on plaintiff's employment would be pure speculation since his grievance was never finally arbitrated, the result of plaintiff's

faction with the union and the friction between plaintiff, the union, and the employer

apparent decision to abandon the arbitration process and pursue the current action against [the union]." *Gaines v. New York City Transit Authority*, 528 F.Supp.2d 135, 150 (E.D.N.Y.2007). Indeed, plaintiff cannot characterize defendant's actions as depriving him of access to the grievance process because he walked out of the meeting. *Cf. Yarde*, 360 F.Supp.2d at 564 (no breach of duty of fair representation where plaintiff "excluded herself" and "cut short the processing of [a] grievance" because a union member's "willing[ness] to engage in the grievance process ... is the cornerstone of the contract"). Accordingly, even if his DFR claim was timely and he could prove defendant breached its duty of fair representation, plaintiff would not be able to prove that the union's refusal to speak at the beginning of the meeting caused him injury because he unilaterally ended the grievance process by walking out of the meeting and ceased contact with defendants. Therefore, I respectfully recommend that the union's motion for summary judgment should be granted as to plaintiff's duty of fair representation claim regarding his 2010 termination.

### III. Title VII and ADEA

■■■■ Title VII prohibits discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–16. The ADEA prohibits discrimination based on age. 29 U.S.C. § 623(a)(1). Defendant's motion for summary judgment should be granted on these claims because plaintiff cannot demonstrate that the union's actions were motivated by discriminatory animus. Plaintiff insists that he was the subject of harassment and retaliation not because of his race, national origin, sex, or age, but be-

at the meeting.

cause of his spill report. (Def.'s 56.1 Statement 134; Pl.'s 56.1 Statement 134.) Purported "whistle-blowing claims" based on misconduct unrelated to race, national origin, or sex "are not cognizable under Title VII." *Blue v. Macy's Herald Square,* No. 12 Civ. 5673(PAE), 2013 WL 3717777, at *3 (S.D.N.Y. July 16, 2013). Nor is such a claim cognizable under the ADEA. *See generally Marchiano v. Berlamino,* No. 10 Civ. 7819(LBS), 2012 WL 4215767, at *2 (S.D.N.Y. Sept. 20, 2012) ("Title VII retaliation law is interchangeable with ADEA retaliation law.") Furthermore, plaintiff provides no evidence that the union treated him differently or discriminated against him on the basis of his race, national origin, sex, or age.[18] His claim that the union promoted Ken Orichio, who is Italian American, to shop steward after he spilled a thousand gallons of oil is insufficient to withstand defendant's motion. Plaintiff is not alleging the union denied him a stewardship position based on his race, national origin, sex, or age; and, Orichio's promotion provides no evidence whatsoever regarding the union's representation of Orichio with regards to any discipline for the spill. As there is no evidence that the union discriminated against plaintiff based on a protected status, defendant's motion for summary judgment on plaintiff's Title VII and ADEA claims should be granted.

## IV. Plaintiff's State Law Claims

Plaintiff also claims that defendant breached contracts, intentionally inflicted emotional distress, libeled and slandered him, and discriminated against him on the basis of his criminal record, in violation of N.Y. Exec. Law Section 296(16). Because plaintiffs federal claims should be dismissed, the Court should decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over plaintiff's state law claims. 28 U.S.C. § 1367(c)(3); *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point towards declining to exercise jurisdiction over the remaining state law claims"); *see also Valencia v. Lee,* 316 F.3d 299 (2d Cir.2003) (declining to exercise supplemental jurisdiction); *Seitz v. DeQuarto,* 777 F.Supp.2d 492, 504 (S.D.N.Y.2011) (same). Accordingly, plaintiff's state law claims should be dismissed without prejudice.

## V. Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment on the grounds that there is "[n]o genuine issue as to any material fact that is relevant against the plaintiff exists to merit the [union's] motion for summary judgment." (Pl.'s Notice of Mot. at 1, ECF No. 55.)[19] As plaintiff fails to establish that defendant violated his rights as a matter of law, plaintiff's cross motion for

---

18. Although plaintiff claims that numerous employers discriminated against him based on a NYSDHR charge he filed against a nonparty, it is undisputed that the union was not aware of plaintiffs prior discrimination complaint filed against a former employer. (Def.'s 56.1 Statement ¶ 141.)

19. Plaintiff also "respectfully moves the Court to rule on all three Causes of Action, since a

decision in Defendant's favor based only on the 'due process' claim, would likely result in the library re-instating the barefoot policy following proper procedure. This would then require a whole new case to address the first and second causes." (Pl.'s Notice of Mot. at 2.) The Court has no idea what plaintiff means by this statement.

summary judgment should be denied for the reasons set forth in this Report and Recommendation.

## CONCLUSION

Accordingly, it is respectfully recommended that defendant's motion for summary judgment should be granted and plaintiff's cross motion for summary judgment should be denied.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See* also Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the fourteen-day period. Failure to file a timely objection to this Report generally waives any further judicial review. *Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 46 (2d Cir.2002); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989); *see Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). SO ORDERED.

SO ORDERED.

Filed Feb. 18, 2014.